[Civ. No. 5727. Third Appellate District.—July 2, 1938.]

MOLLIE BICKFORD et al., Appellants, v. F. M. LAWSON, Respondent.

H. W. McGowan for Appellants.

George R. Freeman and Elmer Laine for Respondent.

THOMPSON, J.—The plaintiffs have appealed from a judgment rendered pursuant to a directed verdict in favor of the defendant in a suit for damages for alleged malpractice in setting a broken leg. The verdict was directed on the theory that the plaintiffs failed to qualify certain medical experts to testify to the alleged malpractice and that there is no competent evidence upon which the jury was authorized to find a verdict against the defendant.

The appellants contend the court erred in striking from the record the testimony of Dr. William Harlan, in rejecting evidence of the use of X-ray machines in reducing and treating fractures of the nature which was involved in this case, and in sustaining objections to other evidence tending to show that the defendant was guilty of negligence in setting and treating the limb.

The defendant is a duly licensed physician and surgeon who has practiced his profession in the town of Willows, in Glenn County, for twenty-six years. October 23, 1935, the plaintiff, Mollie Bickford, while walking along a pathway stumbled over a rock and fell to the ground, fracturing both bones of the right leg above the ankle. Temporary splints were adjusted to mobilize the limb by a neighbor, who is a practical nurse. The patient was taken in an automobile to Willows, a distance of 22 miles, to secure the professional service of Dr. Lawson. The defendant examined the injured limb without removing the patient from the machine and readily ascertained that both the tibia and the fibula were broken. He advised taking her to the Enloe Hospital at Chico or to the Woodland Hospital because they were equipped with the most modern facilities for treating such cases. The patient

objected to going to either of those hospitals on account of her financial circumstances. She was therefore taken to the County Hospital, which was not equipped with an X-ray machine. The doctor said it was easy to tell from an exterior examination the nature of the fractured bones and that he believed he could properly set the limb without the use of an X-ray machine. The patient was placed on an operating table and an anaesthetic was administered. The doctor then made a critical examination and reduced the fractured bones by pulling on the heel of the foot and by manipulation with his hands. A fairly accurate adjustment of the bones was thus secured. The bones were placed in substantial apposition and remained undisturbed in that position. Plaintiffs' witness, Dr. T. H. Brown, who took an X-ray picture of the fracture some two months later, said:

"It shows that the fragments of the bone are in pretty good apposition, that is the fragments are brought into a nice position as far as being opposite to each other is concerned. . . . It shows the edges of the bone here are in close apposition to these opposed edges."

In setting the broken bones, Dr. Lawson measured the leg with a steel tape, placed a stockinet on the limb and adjusted a temporary plaster of paris cast to prevent the fractured bones from slipping out of position. After adjusting the cast he again measured the leg and determined that the alignment was proper by means of a straight edge rule. He then split the cast and fastened it in place with adhesive tape to allow for possible expansion from swelling of the limb. Thereafter he examined the patient carefully every day until November 11th, being entirely satisfied with the apparent result. On the last-mentioned date, the swelling of the limb having subsided, he removed the original cast and replaced it with a permanent cast, extending from the toes to a point six inches above the knee. He again renewed his measurements both for alignment and adjustment of the bones. He furnished the patient with calcium tablets to aid the process of nature in knitting the bones and then discharged her from the hospital, warning her against placing weight or strain upon the broken limb. Thereafter the patient visited the doctor once a week until December 20, 1935. From time to time the cast was adjusted to relieve pressure and to minimize the pain. During this entire time the doctor found the limb to be in

satisfactory condition. There was nothing to indicate that the bones were not properly uniting.

December 19, 1935, Mr. and Mrs. Bickford visited Dr. William Harlan, a physician at Arbuckle, 35 miles from Willows. He took an X-ray picture of the fractured limb. The following day Mrs. Bickford told Dr. Lawson that the picture disclosed the fact that the bones had not united and that they were out of alignment. At the request of the defendant they visited Dr. Brown at Orland, who took another X-ray picture, discovering that while the bones were in "nice position as far as being opposite to each other is concerned", they were not properly united and there was evidence that nature was not supplying the normal or proper amount of osseous fluid to form the callus. The defendant then advised his patient to consult a bone specialist. She went to the University of California Hospital at San Francisco for that purpose. She did not thereafter consult with the defendant. Through the medical staff of the last-mentioned hospital an operation to aid the uniting of the bones was performed January 2, 1936. The limb was then placed in a cast. On March 23d, through the advice of the hospital physicians, the cast was removed and the limb was left without support other than the usual bandages. The bones failed to properly unite. The lack of callus left a weakened condition. April 23d the cast was replaced. This suit for damages for malpractice was then commenced against the defendant and the trial occurred June 2, 1936. At the close of plaintiffs' evidence the court directed the jury to return a verdict in favor of the defendant. From the judgment which was accordingly rendered, this appeal was perfected.

 We are of the opinion the court properly directed a verdict against the plaintiffs. There is no substantial evidence to support a judgment against the defendant for malpractice in setting the broken leg. In their effort to prove that Dr. Lawson was guilty of negligence in diagnosing the nature of the injury in reducing the fracture and in treating the patient they rely upon the fact that he failed to use an X-ray machine, or mechanical tension on the limb and that the bones did not properly unite because of a lack of normal development of callus.

It is true that Dr. Lawson took no X-ray picture of the fracture for the reason, as he stated, that "I did know [the

character of the fracture] in a general way I could feel the break, and feel the general direction of it. . . . My judgment was that I could judge the thing, the bone in her leg by feeling it and seeing it, and that is the way I was satisfied to treat it that way''. The defendant possessed no X-ray apparatus. He advised the patient to go to the Woodland or Enloe Hospital where all modern apparatus were accessible, but she declined to do so because of her financial circumstances. The doctor believed he could properly reduce the fracture and treat the injury without an X-ray machine. The chief use of that machine in the case of an ordinary fracture of a limb is to ascertain the nature of the broken bones to secure an accurate adjustment thereof. Apparently he succeeded in properly reducing the fracture without the X-ray picture, for Dr. Brown, who took a picture of the limb two months later testified that the bones were then in ''nice position as far as being opposite to each other is concerned''. There is absolutely no evidence that Dr. Lawson did not adjust the broken bones in direct alignment and in absolute apposition. With the exception of the use of an X-ray machine, and without artificial tension on the limb there is no contention that he did not follow the most approved method of medical experts in that vicinity in setting the broken bones. It may not be said, as a matter of law, that the failure to use an X-ray machine in the reducing of a fractured limb constitutes negligence under all circumstances. The necessity of employing an X-ray apparatus in reducing a fractured limb depends entirely upon the circumstances of the particular case. The question as to whether the reduction and treatment of a fractured limb without the use of an X-ray machine constitutes negligence, depends upon what an ordinarily skilled physician practicing in that vicinity, in the exercise of due care and professional judgment, would be required to do under like circumstances. The determination of those questions depends upon expert testimony. (*Perkins* v. *Trueblood*, 180 Cal. 437, 443 [181 Pac. 642]; *Arais* v. *Kalensnikoff*, 10 Cal. (2d) 428 [74 Pac. (2d) 1043].)

In the present case the plaintiffs called three medical experts. Dr. Brown took an X-ray picture of the injured limb December 20th, two months after the leg was broken. He testified very fully regarding the condition of the fracture as it then appeared. In substance he testified that he found

the bones in nice apposition, but that there appeared to be an absence of callus to properly unite them. This furnishes no evidence of negligence on the part of the defendant in the absence of expert testimony of acts or omissions on his part indicating a lack of ordinary professional treatment of the fractured limb in conflict with the recognized practice of other skilled physicians in that vicinity. In 20 California Jurisprudence, page 1077, section 23, it is said: "It is held that liability is not established by a failure to take X-ray photographs of an injured limb." In support of the preceding declaration of law, see *Scherer* v. *Eidenmuller*, 45 Cal. App. 372 [187 Pac. 445].

The mere fact that nature failed to supply a normal development of callus to properly unite the bones within the period of two months or more after the fracture occurred, or that the defendant failed to discover that unusual condition, does not prove that he was guilty of any negligence which created a liability for malpractice on his part. There is no evidence in this case that the defendant erred in his professional judgment in reducing the fracture or in treating the patient, which contributed to the absence of a normal supply of callus. No expert witness testified to any such omission on his part. The formation of callus depends on the age and physical condition of the patient. Callus forms much more quickly in a young and strong patient than in an older or weaker person. Where the system lacks calcium or adequate lime salts the fractured bones knit very slowly and sometimes not at all. (Herzog's Medical Jur., p. 257, sec. 324.)

█ The court did not err in sustaining an objection to a question seeking to elicit a statement assumed to have been made by Dr. Brown in the presence of the defendant and Mrs. Bickford immediately after examining the X-ray picture which was taken on December 20th. It is asserted this question was propounded for the purpose of proving an admission of negligence on the part of the defendant. Evidently Dr. Lawson made no statement in the nature of an admission at that time. At the request of counsel to "Go ahead and state what Dr. Lawson said," Dr. Brown replied, "He really didn't have much to say. I don't recall him saying anything right now, I don't believe he did." To the subsequent question, "What did Dr. Brown say in his presence?" an objection

was sustained. The only competent purpose of the last inquiry would be to uphold the theory that Dr. Brown then charged the defendant with some specific act or omission of negligence which he failed to deny. It does not appear that any such accusation was made by Dr. Brown. The plaintiffs did not then claim that such an accusation was made by Dr. Brown. There was no offer to prove by the witness any such statement.

In the absence of such an offer to prove an uncontradicted charge of negligence, the ruling of the court did not constitute reversible error. (*Snowball* v. *Snowball,* 164 Cal. 476, 479 [129 Pac. 784] ; *Grandy* v. *Southern Pac. Co.,* 9 Cal. App. (2d) 441, 444 [49 Pac. (2d) 1127] ; *People* v. *Pereles,* 125 Cal. App. (Supp.) 787, 792 [12 Pac. (2d) 1093].)

█ The court did not err in striking from the record the testimony of Dr. William Harlan, on the ground that he was not qualified as an expert witness for the reason that it affirmatively appears that he had no knowledge of the customary method of treatment of similar fractured limbs employed by other members of the medical profession in that locality.

Dr. Harlan had practiced his profession at Arbuckle, thirty-five miles from Willows, for a period of over twenty years. He was called by the plaintiffs as an expert witness and he was examined at length. At the request of plaintiffs he took three X-ray pictures of the fractured limb on December 19th, and testified, over the objections of the defendant, to the result of the defendant's setting of the leg. He did not testify that the bones were not found to be in proper apposition or alignment, but he did say that while there was evidence of the presence of callus there was a lack of adequate supply thereof, and that the bones had not properly united and that the limb was weak. Over the specific objection of the defendant on the ground that a foundation for his expert testimony for the purpose of showing negligence in this malpractice case had not been established, he was first permitted to answer a lengthy hypothetical question to the effect that it was not accepted medical practice in that or any other locality to attempt to set a broken leg without the use of X-ray apparatus and without applying traction or tension upon the foot to adjust the bones. He testified there were three approved methods of applying traction for that purpose, namely, by means of weights, pulling on the limb and with the aid

of steel bars or pins. He admitted it was a matter of judgment as to which should be used. The purpose of such tension was conceded to be the procuring of proper alignment and contact of the ends of the broken bones. There seems to be no dispute regarding the fact that the bones were in "nice position". They were held in that position by the plaster cast. On cross-examination it was conclusively established that the doctor was not qualified to testify as a medical expert in this malpractice case for the reason that he admitted he did not know what the practice of other physicians was in reducing and treating such fractures in that or any other locality. He testified in that regard:

"Q. You have answered the [hypothetical] question propounded to you by saying no. You mean that isn't the way you would have done it *yourself?* A. Yes. It isn't the way I would have done it. . . . It seems as though any of us would use traction towards trying to set a bone of that type in an individual the size she was. In a smaller person it would be done with ease, but an individual her size it couldn't be done without traction. Q. In other words, this is true: That after taking the picture on December 19th, some seven or eight weeks subsequent to the date of her accident, and after seeing the lady herself, her size, that you determined that *so far as your judgment was concerned,* you would have used traction on the break? A. Yes. . . . Q. You don't practice any place else but down at your hospital at Arbuckle? A. That's all. Q. Do you know any doctors up here? A. I know one. Q. Who do you know? A. Dr. Reese. Q. Dr. Reese is an osteopath. He was formerly down there with you wasn't he? A. Yes. Q. You have never associated yourself with any of the other doctors up here in performing the reduction of any fractures? A. No. Q. You don't know if in the judgment of Dr. Brown of Orland, or Dr. Coffey of Orland, they would have used weights? A. No, I don't know if they would or not but I feel they should. Q. Your judgment tells you that is the proper thing to do, but *you don't know what any of the rest of them do or have done in the past, in circumstances of like kind, or in like circumstances, do you?* A. No. . . . "

"Q. Do you know of any case other than in your own hospital, or take in Glenn County, where any doctor practicing here has used the traction method in setting that kind of fracture? A. I couldn't say that, *I haven't been around to see*

*that from my own personal knowledge.* Q. Do you know of any cases up here of fractures of the tibia where doctors have used the plaster cast method without traction? A. *I couldn't say I know it from my own knowledge. . . .* Q. Assuming further that within less than three weeks after this leg had been put into a cast, a measurement showed that the legs were of equal length, the straight edge showed it was straight; that the cast was taken off; that manipulation indicated that the bones were in apposition; that further measurements were taken with a tape line and straight edge, would you say whether Dr. Lawson, under those circumstances, was justified in believing at that time that the fracture had been reduced? . . . A. Yes, I think that he was. He had set the bones in that way and figured it was right or he wouldn't have left it in that position. Without a doubt he was justified in feeling that it was all right. Q. If the condition you saw in your X-ray taken December 19th, existed on November 11th, at the time that he changed that cast, that condition would be apparent to the touch wouldn't it? A. Yes, it would. Q. And you wouldn't need an X-ray to discover it would you? A. No, you didn't need an X-ray to see there was something wrong with that leg at any time.''

At the close of plaintiffs' evidence the defendant moved to strike out the testimony of Dr. Harlan, on the ground that it affirmatively appears that he was not qualified to testify as a medical expert in this malpractice case. That motion was properly granted, and his evidence was stricken from the record. Clearly Dr. Harlan based his conclusions regarding the necessity of using the X-ray pictures and in employing the tension method of reducing a fractured limb upon his own judgment and not upon the customary practice of other skilled physicians in the locality of Willows or elsewhere. He conceded that he did not know what the practice of other physicians in that locality is in that regard. His evidence was therefore incompetent and it was properly stricken from the record.

The rule is thoroughly established in California that to qualify a medical expert witness to testify to the negligent reduction and treatment of a fractured limb by another physician in a suit for malpractice it must first appear that the witness possesses the required professional knowledge, learning and skill to express his opinion with due authority, but

he must also be familiar with the method of treatment of similar ailments and with knowledge and skill required therein by other physicians in that locality. (*McGuire* v. *Baird,* 9 Cal. (2d) 353, 356 [70 Pac. (2d) 915] ; *Arais* v. *Kalensnikoff, supra; Hiraide* v. *Cochran,* 109 Cal. App. 377, 381 [293 Pac. 165] ; *Rasmussen* v. *Shickle,* 4 Cal. App. (2d) 426, 430 [41 Pac. (2d) 184] ; *Taylor* v. *Fishbaugh,* 26 Cal. App. (2d) 300 [79 Pac. (2d) 174] ; 3 Wharton & Stille's Medical Jur., p. 465, sec. 476.)

We ·are of the opinion the objection to the hypothetical question propounded to Dr. Gambell by the plaintiffs was properly sustained for the reason that it did not contain all of the essential circumstances incident to the setting of the limb and to the treatment thereof disclosed by the evidence upon which a fair and intelligent opinion could be expressed. It was therefore incompetent and misleading. The doctor was qualified to testify as a medical expert, but he did not render to the patient professional service. All the knowledge he possessed of the condition of the fractured limb and of the services rendered by the defendant was acquired from the facts related to him in the hypothetical question and from an examination of the X-ray pictures which were subsequently taken. The question was too incomplete, considering the technical nature of the operation and the extended treatment of the patient, to enable a physician to acquire the necessary information upon which he could fairly and intelligently express an opinion regarding the alleged malpractice. Several important details of the operation disclosed by the evidence are omitted. Few of the details of actually reducing the fracture are related. In propounding that hypothetical question, the plaintiffs did not rely on the defendant's failure to use X-ray pictures. That fact was not stated. They seem to have depended chiefly on a failure to use "traction" in adjusting the broken bones. The question concludes with this request of the witness:

"Will you state whether or not in your opinion such method of reduction *without traction* . . . and such . . . after treatment was the type of ordinary, skillful, or careful surgical treatment common in this vicinity?"

The record clearly indicates that while there was an oblique fracture of the bones, they were not shattered but remained in good apposition, which was apparent from observation;

careful manipulation and feeling of the injured limb by the surgeon. It was not a complicated fracture. The tibia, or shin-bone, lies close to the surface and is often readily felt and adjusted in an ordinary fracture thereof by manipulation with the hands. The tibia and fibula bones articulate together. It is apparent there was a simple fracture of these bones without complications. Under such circumstances they may be properly set without artificial traction or the use of X-ray pictures. The facts of this case indicate without conflict that the bones were not overlapping or out of proper adjustment. Dr. Lawson testified that he had no trouble in determining that fact. There is no evidence of undue tension of the muscles. There is no evidence the bones were ever out of proper alignment or apposition. The X-ray pictures taken by Dr. Brown two months after the accident occurred disclosed the fact that the bones were in "nice position". There is no evidence to the contrary. Those facts have an important bearing on the question as to whether artificial traction of the limb was necessary under the circumstances of this case. Yet those essential facts were not included in the hypothetical question. Some of the details of the setting of the limb were omitted, such as the fact that the defendant adjusted a stockinet and treated the patient's leg for blisters which appeared thereon, that he changed the cast and relieved pressure from time to time in an almost daily examination of the patient for a period of nearly three weeks after the operation, and that he furnished her with calcium tablets to aid nature in producing a normal supply of callus, as well as a number of other important details of the setting of the limb and the treatment of the injury. It appears that the patient had an inherent tendency toward unusually brittle bones or what is commonly termed "fragilitis ossium". She had previously suffered three or four other fractures of bones. Evidently the condition of her constitution was such that it lacked the normal deposits which contribute to speedy and natural uniting of broken bones. That fact was not mentioned in relating the course of the treatment which she received. Moreover, the husband of the patient testified that Dr. Lawson did apply traction to the limb in setting the bones. He said:

"He took hold of the bottom of the foot, on the heel, and pulled on it and run his fingers along the top of it where the

break was. I suppose in his judgment he was satisfied where it was, for all I know.''

Both the patient's husband and a trained nurse assisted the doctor in setting the limb. Those facts were not included in the hypothetical question. We think the question was incomplete and misleading, and that the objection thereto was properly sustained.

Where the facts related in the hypothetical question omit material undisputed evidence necessary to a fair, intelligent and sound opinion of the witness regarding the problem to be determined, it is not error for the court to sustain an objection thereto. The chief test of the competency of a hypothetical question which seeks to elicit the professional opinion of a physician regarding the treatment of a patient is whether it is a full and fair recital of all the essential evidence disclosed by the record on the particular issue which is involved. Where the question assumes facts in direct conflict with the undisputed evidence, or omits material facts upon which a determination of the problem depends, the hypothetical question becomes misleading and it is then likely to lead the witness to a false conclusion, and should be rejected. (*Johnson* v. *Clarke,* 98 Cal. App. 358, 363 [276 Pac. 1052]; *Estate of Gould,* 188 Cal. 353 [205 Pac. 457]; *Graves* v. *Union Oil Co. of Calif.,* 36 Cal. App. 766 [173 Pac. 618]; 3 Jones Comm. on Evidence, 2d ed., p. 2427, sec. 1327.) In the Graves case it is further said:

''The trial judge is in a position to have the circumstances far more clearly before him than the appellate court can have them. *A large discretion relating to the form of the question must necessarily rest with the judge.*''

We are of the opinion defendant's objections to certain questions which were propounded to Dr. Gambell and Dr. Lund regarding the customary use of X-ray pictures, tension on the limb and the usual treatment of physicians in the vicinity of Willows in the reduction of a fractured tibia and fibula, should have been overruled, but that the sustaining of those objections is not reversible error under the circumstances of this case. Those physicians duly qualified themselves to testify regarding the customary practice in reducing and treating similar fractures in that vicinity. That evidence was competent. However the evidence shows without conflict that the bones were set in ''nice position''

and alignment in the present case, and that they did not overlap or slip from normal position even without the use of X-ray pictures and without artificial tension. They were in that proper position December 20th and as long as the patient was under the care of the defendant. There is no evidence to the contrary. The excluded questions do not indicate that the use of X-ray pictures or tension on the limb would have improved the adjustment of the bones or the possibility of a better union of the fractured portions thereof. There was no offer to prove any such condition. Since the reduction of the fracture was properly made without the use of X-ray pictures and without artificial tension of the limb there was no prejudicial error in excluding expert testimony that such means were ordinarily employed by other physicians in the treatment of similar fractures in that vicinity. ■ The omission of an accepted method of treating an ailment does not constitute actionable negligence unless it substantially contributes to the injury as a result thereof. In the case of *Hesler* v. *California Hospital Co.*, 178 Cal. 764 [174 Pac. 654], respecting the duty which a physician owes to his patient, the court said:

" 'Upon consenting to treat a patient, it becomes his duty to use reasonable care and diligence in the exercise of his skill and the application of his learning *to accomplish the purpose for which he was employed.* He is under the further obligation to use his best judgment in exercising his skill and applying his knowledge.' (*Pike* v. *Honsinger*, 155 N. Y. 201, 209 [63 Am. St. Rep. 655, 49 N. E. 760, 762].) 'The difficulties and uncertainties in the practice of medicine and surgery are such that no practitioner can be required to guarantee results, and all the law demands is that he bring and apply to the case in hand that degree of skill, care, knowledge, and attention ordinarily possessed and exercised by practitioners of the medical profession under like circumstances.' (*Zoterell* v. *Repp*, 187 Mich. 319, 330 [153 N. W. 692, 695].) 'It is never enough to show that he has not treated his patient in that mode, nor used those measures, which in the opinion of others, even medical men, the case required; because such evidence tends to prove errors of judgment, for which the defendant is not responsible as much as the reasonable care and skill, for which he may be responsible.' (*Leighton* v. *Sargent*, 27 N. H. 460, 474 [59 Am. Dec. 388].)''

There is no evidence in this case, and there was no offer to prove that the earlier use of X-ray pictures would have disclosed the absence of a normal accumulation of callus so as to have aided a more speedy union of the bones. We assume the manner of setting the bones without the use of X-ray pictures and without artificial tension had nothing to do with the lack of the development of callus which undoubtedly resulted from the physical condition of the patient. The appellants have not contended the alleged negligence of the defendant in setting the limb contributed to the lack of callus.

From a careful reading of the entire record we are convinced that the only omission of which the plaintiffs may reasonably complain is a failure to use X-ray pictures after the reducing of the fracture, at an earlier date, with the possibility that the defendant might have thus discovered the lack of callus and that he would then have advised his patient to consult a bone specialist. But the defendant testified that he had no intimation of that lack of callus until the X-ray picture was taken December 20th. That omission, if it may be said to have contributed to the injury of the patient, was a mere error in judgment which does not constitute actionable malpractice.

We are therefore of the opinion the rejected evidence complained of does not constitute reversible error. There was not a miscarriage of justice in this case. It seems apparent that with the most favorable responses of the expert witnesses to the questions propounded to them which could be anticipated this case would not support a judgment against the defendant for malpractice, under the circumstances disclosed.

The court therefore properly directed a verdict in favor of the defendant.

The judgment is affirmed.

Plummer, J., and Pullen, P. J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 29, 1938.