# FLOYD et al. v. WALLS.—168 S. W. (2d), 602.

Western Section. December 13, 1941.

Petition for Certiorari denied by Supreme Court, February 28, 1942.

152

Albert F. Johns, Walter P. Armstrong, and Walter P. Armstrong, Jr., all of Memphis, for plaintiffs in error.

Thomas L. Robinson and John E. Robinson, both of Memphis, for defendant in error.

KETCHUM, J. This is a malpractice suit brought by Walls against Dr. Bedford F. Floyd, Dr. R. Eustace Semmes, and Dr. Francis Murphey. The declaration is in three counts charging negligence (1) in failing to em-

154

ploy the requisite degree of care and skill in the diagnosis and treatment of the plaintiff for injuries received in an accident as hereinafter described; (2) in failing to take X-ray pictures of the plaintiff's back, which if taken would have revealed an injury to the fourth lumbar vertebra which could have been treated at a much earlier date than it was treated; and (3) negligence in prematurely abandoning the case. On the trial the first and third of these charges of negligence were eliminated and the case went to the jury on the single charge of negligence in failing to take X-ray pictures of the plaintiff's back. On the argument of a motion for a directed verdict at the close of the plaintiff's proof a voluntary nonsuit was taken as to Dr. Murphey, the motion for a directed verdict was denied, and the case proceeded against Dr. Floyd and Dr. Semmes. There was a verdict in favor of Dr. Semmes, and one in favor of the plaintiff and against Dr. Floyd for $3000. On the motion for a new trial, the judge suggested a remittitur of $1000 which was accepted by the plaintiff, and a judgment was entered in his favor and against Dr. Floyd for $2000. Dr. Floyd alone has appealed.

The plaintiff was employed by the National Rose Spring & Mattress Company, of Memphis, and worked in a large store room in which bales of cotton linters were piled in stacks twelve or fifteen feet high. On September 13, 1939, while he was bending over marking one of the bales, a bale fell on him from the top of the stack, striking him on the head and inflicting upon him a very serious head injury. He was at once taken to the Baptist Memorial Hospital and Dr. Floyd, who was the physician employed by the insurance company carrying the compensation insurance for the mattress company, was called to treat him.

Dr. Floyd first saw the plaintiff in the emergency operating room at the hospital. He was then unconscious and remained in that condition, or a semi-conscious condition, for several days or probably a week. Dr. Floyd from his examination was of opinion that he had sustained a serious brain injury so he called in Dr. Semmes and Dr. Murphey who were neurological surgeons specializing in the treatment of injuries to the brain and spinal cord, to assist him. Together these doctors made a careful examination of the entire body of the patient, who was still unconscious, and found a bruise on one shoulder, but no broken bones. As the most serious injury was to the head they caused X-rays of the skull to be made and drew some of the fluid from the spinal column for the purpose of drainage. This fluid was bloody, indicating a very serious injury to the brain. The X-ray pictures showed a horizontal fracture on the right side of the skull and a vertical fracture extending upwardly from about the middle of the horizontal fracture.

The plaintiff was assigned to a room in the hospital and from the first, three or four regular day and night nurses were employed to attend him. Later he had one nurse who was on twenty-four hour duty. At first the doctors saw him five or six times a day, but as he improved they saw him less frequently. After he regained consciousness he complained of intense pain in the head; he was very nervous and restless and also complained of pain in his chest and shoulder and in his legs. The three doctors all testify that he did not at any time complain to them of any pain in his back. The nurses' chart contained notes that he complained of pain in his shoulder and chest and legs and that he was very restless and complained of intense pain in his head. The plaintiff and his wife testify, however, that he made frequent com-

plaints to the doctors of intense pain in the back, and that they told him that this was the result of the concussion of the brain, and that the only treatment for it was rest and that this pain would pass away in time. This conflict in the testimony, which is about the only conflict in the evidence, must be resolved in favor of the plaintiff, in view of the verdict in his favor.

In view of the complaints made by the plaintiff of pains in his chest and shoulder the defendants caused numerous X-ray pictures to be made of those areas but those pictures revealed no fractures. No pictures were made of his back because, the defendants say, the plaintiff made no complaint of pain in that region, and their very careful examination of his back to ascertain whether there was any injury to the spinal cord disclosed no objective symptoms of any fracture of the spine. The plaintiff had recovered sufficiently from his injuries to warrant his discharge from the hospital at the end of two weeks, and he was permitted to go home and remain in bed as the defendants regarded absolute rest as the best treatment for his injuries. After the plaintiff went home the doctors visited him there until he had recovered sufficiently to come to their offices, which he did, from time to time, accompanied by his wife, until the 26th of December, 1939. He still complained of pains in his head and, he says, in his back and other parts of his body; and he had an impediment in his walk so that he had to be assisted by his wife; but the defendants thought that these pains and the shuffling gait were attributable to the nerves centering in the brain and that they would gradually subside.

On December 26, Dr. Semmes was engaged when the plaintiff came to his office; he declined to see him explaining that he had a number of patients in his office and

an emergency case that required his attention as soon as he could get there. The plaintiff was evidently dissatisfied with this treatment as he went on that same day to consult his lawyer Mr. Robinson. Mr. Robinson advised him to consult another doctor and recommended Dr. Leo F. Pierotti. Dr. Pierotti had X-ray pictures made of his back, chest and shoulder, those being the parts of the body of which he complained. The X-rays of the chest and shoulder revealed no injuries in those areas, but one of the pictures of the back showed a compression of the superior anterior part of the fourth lumbar vertebra. This was three and one-half months after the accident and after the injury there had been a formation of callus which was a new growth of osseus tissue around the fracture. This is nature's way of healing a fracture of this kind, and this growth of callus or the formation of new bone ordinarily extends over a period of six to eight weeks. The vertebra was not out of alignment and there was no indication of any pressure upon the spinal cord.

As treatment for this fracture Dr. Pierotti sent the plaintiff to St. Joseph's Hospital where he was kept on a Bradford frame for two weeks. The purpose of this was to immobilize the joint and render the patient more comfortable. He also associated with him Dr. Lipscomb, an orthopedic surgeon, who applied a brace which the plaintiff was still wearing up to the time of the trial.

Dr. Pierotti also suspected a displacement of an intervertebral disc which was a cushion of cartilege between the vertebrae, and in order to rule this out he sent the plaintiff to the hospital a second time to make what is known as the lipidol test. This involved the injection of an opaque substance into the spinal cord so that an X-ray picture could be made. This test was negative in that it

showed that there was no displacement of the interverte-
bral disc, and confirmed the diagnosis of the defendants
that there was no pressure upon the spinal cord.

Dr. Pierrotti was the only expert witness who testified
for the plaintiff. Nowhere does he say in his testimony
that Dr. Floyd was negligent in failing to take X-ray
pictures of the plaintiff's back. The most that he said
was that at the time he examined the plaintiff (three and
a half months after the accident), his condition justified
the taking of X-ray pictures. He did not say that he
would have taken X-rays if he had examined him imme-
diately after the accident and if he had only the infor-
mation that Dr. Floyd had. He did say that if he had been
in Dr. Floyd's position he would probably have used
X-rays, but he did not say that the use of X-rays in mak-
ing such a diagnosis was necessary according to the stand-
ards of practice in the medical profession in and around
Memphis.

He said:

"Q. State whether or not it is customary in cases
where the doctor's attention is called to an injury or
complaint in the back to use X-rays or have X-ray pic-
tures taken? A. Given a certain injury where the
history and physical findings manifest symptoms sufficient
to warrant an X-ray, it is my opinion that an X-ray pic-
ture should be made.

. . . . . . .

"Q. Doctor, I will ask you to state what is the ac-
cepted practice and custom in this community in regard
to the diagnosis, treatment and care of back injuries in
the vertebral region? A. Well, the primary situation
is to make a diagnosis by X-ray in order to make a cor-
rect diagnosis for the purpose of proper treatment as
early as possible.

"Q. Doctor, state whether or not in your opinion a full and accurate diagnosis of back injuries in the vertebral region is possible without the use of X-ray? A. I would say that it is not."

It will be noticed that here Dr. Pierotti starts with the assumption that there was a back injury, an assumption that would not have been warranted at the time Dr. Floyd made his examination. If he had known that the plaintiff had suffered a back injury, or if he had had any objective indication that such an injury existed, then the defendant should certainly have had X-ray pictures made. But without any such objective indication, and with the information he had, should he have assumed that the plaintiff had suffered a back injury?

On this point Dr. Pierotti says: "On any suspected injury it is customary to obtain as thorough a history as possible from the patient, if conscious; or from relatives, employer or employees; make a thorough physical examination, and, if the findings justify, X-ray the patient in order to make an accurate diagnosis for proper subsequent treatment."

It is easy to say that if from the history of the case and from the objective symptoms, the findings warrant the taking of X-ray pictures, they should be taken; for instance if the patient complained of a pain in the back, and the examination revealed no objective symptom to account for it, then clearly the examining doctor should have an X-ray picture made. But in passing upon the question whether Dr. Floyd was negligent in failing to take X-ray pictures we must bear in mind that he found no objective symptoms of an injury to the back, but did have an objective symptom in the form of a severe brain injury which in his judgment was sufficient to account

for the pain which the patient suffered. This is a factor which Dr. Pierotti did not take into consideration.

Dr. Pierotti based his judgment as to whether plaintiff's condition justified the taking of X-ray pictures upon the facts as they existed at the time he made his examination. Three and a half months had then elapsed and the plaintiff had in a large measure recovered from the brain injury which in the opinion of Dr. Floyd, Dr. Semmes and Dr. Murphey was in itself sufficient to account for the pain the plaintiff suffered in the back and legs and for his shuffling gait. The mere fact that Dr. Pierotti thought his findings warranted the taking of X-rays does not establish negligence on the part of the defendants, He went no further than to say that an X-ray picture was justified. He did not say that the standard of practice in the community required that X-rays be taken. He said:

"Q. Now then, you talked about taking an X-ray when a fracture is suspected. Before you get to the point of taking an X-ray, you have got to have the suspicion of a fracture? A. Yes, that's right.

"Q. And whether or not a fracture is suspected depends entirely on the judgment of the doctor who is examining the patient? A. Yes; if he doesn't see enough evidence in justification for an X-ray, he doesn't take one.

"Q. That is a matter for your judgment? A. Yes.

"Q. Isn't it a fact that whether or not an X-ray shall be taken in any case in the last analysis depends upon the judgment of the doctor in charge? A. Yes, he is in charge of the patient and whether he deems it necessary or not depends upon what he thinks about it."

The plaintiff was paid the full amount due him for his injury under the Workmen's Compensation Act, Code 1932, Sec. 6851 et seq.; and the insurance company in-

suring his employer paid all of his hospital expenses and doctors' bills, and he is entitled to recover in this action, if anything, only for the alleged negligence of Dr. Floyd in failing to take X-ray pictures of his back and the pain and suffering resulting from such negligence. All other claims for damages are eliminated.

Dr. Floyd was employed by the insurance company which insured the Mattress Company. He is shown to have been a specialist in industrial accident cases. Dr. Pierotti concedes this and speaks highly of the position occupied by him and by Dr. Semmes and Dr. Murphey, in their special fields of surgery.

Dr. Floyd was called immediately to treat the plaintiff and upon examining him saw that he had suffered a very severe brain injury; so he at once called to assist him Dr. Semmes and Dr. Murphey who are generally recognized as the leading brain surgeons in Memphis. They saw him regularly and often while he was in the hospital. They made X-ray pictures of his skull and chest and shoulder, the regions in which they say he complained of suffering pain. These pictures were negative, that is they showed no objective indications of injury to those parts of the body. They did not take any pictures of the back or legs. They were of opinion that the pains of which he complained were attributable to the nerves centering in the brain. They had examined his back and found no objective symptoms of any injury in that region. It is undisputed that they gave him the treatment which in their opinion and judgment his case required. They were of opinion that what he needed most was quiet and rest, and the only medicines they administered were sedatives. His improvement was rapid and satisfactory.

Even if they had taken the X-rays and discovered the compressed fracture of the vertebra, the undisputed proof

is that the fracture would not have healed any more quickly or more completely if the plaintiff had been placed on a Bradford frame at once than it did under the rest in bed which they advised. In fact Dr. Pierotti concedes that the fracture was practically healed at the time he made his examination. His pictures showed this to be the case and showed that the vertebra was not out of alignment. The most that can be said is that if the plaintiff had been placed on a Bradford frame at once he might have been made more comfortable during the six or eight weeks the fracture was healing; but the result would not have been any quicker or any more satisfactory. On this point Dr. Pierotti says:

"Q. Now, doctor, as I understand your testimony, when you come to discuss the results of this case, you say so far as the objective condition is concerned, you can't say it would have been any different if he had received earlier treatment for this partial fracture of the vertebra? Is that correct? A. That's right.

"Q. The only difference, as I understand you, (is that) if it had been discovered earlier the results would not have been any better as far as the final results are concerned, but the complaints of pain would ceased earlier? A. No.

"Q. That is substantially your testimony? A. That's right."

. Dr. Pierotti also testified that if the plaintiff had been brought to him at the outset with a severe concussion of the brain and he had been called upon to treat him at that time he could not say that he would have taken X-ray pictures of his back at that time or that the standard practice of the profession would have required him to do so. He would go no further than to say that an X-ray was indicated at the time he made his examination.

When asked whether the X-ray indicated the presence of an arthritic condition in the spine· Dr. Pierotti answered that there was evidence of a hypothropic spondylitis which had required years to develop, and which could not have developed in the three and one-half months that intervened between the time of the accident and the time the X-rays were made; but he said the traumatic injury might and probably would have aggravated the spondylitis.

██ The law required that the defendant should possess that degree of skill and ability that is ordinarily possessed by men engaged in the practice of medicine and surgery in Memphis, the locality where he practiced. This is the standard that the law requires. Haskins v. Howard, 159 Tenn., 86, 94, 16 S. W. ·(2d), 20. It is not disputed that he was qualified in this respect.

██ Granting this, he will not be held liable for honest mistakes in judgment, but only for the negligent failure to meet the standards required by the profession in the community. As said in Burnett v. Layman, 133 Tenn., 323, 328, 181 S. W., 157, 158, "A physician does not guarantee the cure of his patients. Presuming a careful diagnosis, a physician is not liable for damages resulting from an honest mistake in determining upon the character of treatment to ·be administered, or in determining upon the necessity of an operation. These things are mere matters of judgment upon which an action cannot ordinarily be predicated."

In Casenburg v. Lewis, 163 Tenn., 163, 168, 40 S. W. (2d), 1038, 1040, it is said that "It is the physician's privilege to decide between one of two or more courses in the treatment of his patients and, as said by the Court of Appeals, he could not be held responsible for an erroneous exercise of judgment. That rule is subject, however, to

the limitation that before exercising judgment the physician should inform himself by proper examination so as to ascertain the facts and circumstances on which a reasonable exercise of judgment might rest.''

This brings us to the immediate question in the present case. The test is whether Dr. Floyd and his two associates Dr. Semmes and Dr. Murphey were negligent in failing to have the X-ray pictures made of the plaintiff's back. Their examination made immediately after the accident showed a very serious injury to the brain which in their judgment was sufficient to account for the pains of which the plaintiff afterwards complained. Their examination of his back revealed no objective symptoms of any injury to his back. The treatment which they prescribed was rest in bed which was a recognized treatment for a compressed fracture of a vertebra such as was afterwards discovered when the X-ray pictures were made. His recovery was as rapid and as complete as it would have been if the X-ray had been taken, the fracture discovered and the Bradford frame applied immediately after the accident. The only difference is that he might have been more comfortable if the Bradford frame had been applied earlier. The question is not whether the defendants were negligent in undertaking to reduce a fracture without the use of X-ray pictures; but whether under the recognized standard of practice in the community they were negligent in failing to make X-ray pictures of the plaintiff's back to ascertain whether a fracture existed. There is no evidence that the recognized standards of practice required that X-rays be made under such circumstances. Dr. Pierotti said that the question of whether X-rays should be made was a matter for the individual judgment of the doctor making the examination under the facts of the particular case. And he

declined to say that Dr. Floyd and his associates were negligent in failing to have X-rays made under the facts as they existed at the time they made their diagnosis.

It was not a question for a jury of laymen to say whether under the facts of the particular case the defendants were guilty of negligence in failing to take X-ray pictures of the plaintiff's back. That was a question to be determined upon the testimony of experts skilled in the treatment of such injuries. There is no expert testimony in this case upon which a finding of negligence upon the part of the defendants could be predicated.

In Bickford v. Lawson, 27 Cal. App. (2d), 416, 81 P. (2d), 216, 219, the District Court of Appeals of California said: ''It may not be said, as a matter of law, that the failure to use an X-ray machine in the reducing of a fractured limb constitutes negligence under all circumstances. The necessity of employing an X-ray apparatus in reducing a fractured limb depends entirely upon the circumstances of the particular case. The question as to whether the reduction and treatment of a fractured limb without the use of an X-ray machine constitutes negligence, depends upon what an ordinarily skilled physician practicing in that vicinity, in the exercise of due care and professional judgment, would be required to do under like circumstances. The determination of those questions depends upon expert testimony.''

And in Boyce v. Brown, 51 Ariz., 416, 77 P. (2d), 455, 458, the doctor believed that the patient's pain was due to arthritis, and therefore did not make an X-ray examination, when in fact it was due to a fractured ankle, which an X-ray would have revealed. In upholding a directed verdict for the defendant, the court in answer to the contention that the failure to take X-ray pictures was such obvious negligence that even a lawyer would know that

it was a departure from the recognized standard, said: "We think this contention cannot be sustained. It is true that most laymen know that the X-ray usually offers the best method of diagnosing physical changes of the interior organs of the body, and particularly of the skeleton, short of an actual opening of the body for ocular examination, but laymen cannot say that in all cases where there is some trouble with the internal organs that it is a departure from standard medical practice to fail to take an X-ray. Such things are costly and do not always give a satisfactory diagnosis, or even as good a one as other types of examination may give. In many cases the taking of an X-ray might be of no value and put the patient to unnecessary expense, and, in view of the testimony in the present case as to the arthritis which Mrs. Boyce had, and which Dr. Kent testified would have been his first thought as to the cause of Mrs. Boyce's pain in 1934, we think it is going too far to say that the failure to take an X-ray of Mrs. Boyce's ankle at that time was so far a departure from ordinary medical standards that even laymen would know it to be gross negligence. Since, therefore, there was insufficient evidence in the record to show that defendant was guilty of malpractice, under the rules of law above set forth, the court properly instructed a verdict in favor of the defendant."

█ The fact that Dr. Pierotti thought that the condition of the plaintiff at the time he examined him warranted the taking of X-rays is not in itself evidence that the defendants were negligent in failing to take them at the time of their examination and diagnosis more than three months earlier. The question of whether or not an X-ray should have been taken as a part of the diagnosis presented a question of judgment for the doctors making the diagnosis, and if they possessed the requisite skill,

and exercised good faith in making their examination, they will not be held liable for malpractice because of a mistake in judgment in failing to take them. Young v. Dozier, 4 Tenn. App., 148; Calhoun v. Fraser, 23 Tenn. App., 54, 126 S. W. (2d), 381; Schumacher v. Murray Hospital, 58 Mont., 447, 193 P., 397; Scherer v. Eidenmuller, 45 Cal. App., 372, 187 P., 445; Bickford v. Lawson, 27 Cal. App. (2d), 416, 81 P. (2d), 216; Boyce v. Brown, 51 Ariz., 416, 77 P. (2d), 455; Duckworth v. Bennett, 320 Pa., 47, 181 A. 558, 559.

In Young v. Dozier, supra, it is said: "As the surgeon does not guarantee a cure and there is not even an implied promise to effect a cure or even a partial healing, he is only required to discharge his duty with reasonable skill and ability. Presuming a careful diagnosis he is not liable for damages resulting from an honest mistake in determining upon the character of treatment to be administered or in determining upon the success of the operation. These things are mere matters of judgment upon which an action cannot ordinarily be predicated, and negligence is not to be inferred therefrom." (Citing cases.)

And in Duckworth v. Bennett, supra, the supreme court of Pennsylvania said: "Where competent medical authority is divided, a physician will not be held responsible if, in the exercise of his judgment, he followed a course of treatment advocated by a considerable number of his professional brethren in good standing in his community. . . . A physician is required to exercise only such reasonable skill and diligence as is ordinarily exercised in his profession."

And in Boyce v. Brown, supra [51 Ariz., 416, 77 P. (2d), 457], the supreme court of Arizona said: "The testimony of other physicians that they would have followed a dif-

ferent course of treatment than that followed by the defendant is not sufficient to establish malpractice unless it also appears that the course of treatment followed deviated from one of the methods of treatment approved by the standard in that community."

■ There is not only no evidence that the standards of practice in and around Memphis required the taking of X-rays, but all the expert witnesses including Dr. Pierotti, agree that this is a matter for the individual judgment of the doctor making the examination under the facts of the particular case. This being true we are of opinion that under the uncontradicted proof the plaintiff has failed to prove negligence on the part of the defendants, and that the motion for a directed verdict at the close of the proof should have been granted.

■ We think this was true for another reason also. There is no evidence that the growth of callus on the plaintiff's vertebra was not caused by the spondylitis which Dr. Pierotti testified had been present there for several years. The plaintiff was being treated for injuries sustained in the accident and not for his spondylitis. It is by no means certain that an X-ray made at the time of the accident would have shown the spondylitis, as it appears that this condition may have been greatly aggravated in three and one-half months as the result of the accident. At any rate it would have been left to the jury to speculate whether the callus growth which showed in the X-ray was the result of the accident or of the spondylitis. As said by Taft, Judge, in Ewing v. Goode, C.C., 78 F. 442, 444: "When the burden of proof is on the plaintiff to show that the injury was negligently caused by defendant, it is not enough to show the injury, together with the expert opinion that it might have occurred from negligence and many other

causes. Such evidence has no tendency to show that negligence did cause the injury. When a plaintiff produces evidence that is consistent with an hypothesis that the defendant is not negligent, and also with one that he is, his proof tends to establish neither.''

 It is elementary that a jury will not be allowed to base a verdict upon mere conjecture or speculation.

On the uncontradicted proof in this case we are of opinion that the trial judge should have sustained the defendants' motion for a directed verdict at the close of all the proof, and that for this reason the second assignment of the plaintiff in error must be sustained. This renders unnecessary the consideration of the other assignments of error complaining of a refusal of a special instruction requested and the excessiveness of the verdict.

Let the judgment be reversed and the plaintiff's suit be dismissed at his cost.

Anderson and Felts, JJ., concur.