QUINLEY *v.* COCKE *et al.*

(*Jackson,* April Term, 1945.)

Opinion filed March 2, 1946.

GRANVILLE FARRAR and H. H. HONNOLL, both of Memphis, for plaintiff in error.

WALTER P. ARMSTRONG, ALBERT JOHNS, and EMMETT W. BRADEN, all of Memphis, for defendants in error.

MR. JUSTICE NEIL delivered the opinion of the Court.

The plaintiff in error, who will be hereinafter referred to as the plaintiff, brought suit in the Circuit Court of Shelby County against Dr. E. W. Cocke and Gartly-Ramsay Hospital of Memphis for damages, both compensatory and exemplary. The declaration, which contains two counts, alleges the following facts:

In the first count it is alleged that the plaintiff entered said hospital as a pay patient on September 16, 1942, for rest and treatment for a nervous condition and other ailments, brought about principally by acute gall bladder attacks and acute pain and suffering resulting therefrom. He entered the hospital upon the advice of his attending physician, who also advised that he consult the defendant Dr. E. W. Cocke, who held himself out as being skilled in the treatment of nervous disorders.

It is further alleged that Dr. Cocke advised the administration of certain electric shock treatments and that he submitted to one of said treatments by Dr. Cocke, assisted by certain attendants, servants, etc., without injurious results. However, on September 21, 1942, a second treatment was administered by the defendant assisted by several servants and attendants. It is then alleged that, after he was removed to a private room and upon regaining consciousness, plaintiff found he was suffering severe pain in the right hip and thigh; that this condition was called to the attention of Dr. Cocke, but he ignored plaintiff's complaint until September 24, 1942, when an X-ray picture was made which showed his hip had been fractured. The declaration further charges that "The equipment and instrumentalities that were used in administering the shock treatment, from which his said injuries and damages resulted, were under the exclusive care, custody, and control, of the defendants. That when properly used and in the exercise of due care and caution they caused and resulted in no injury to patients. That due to the negligent, careless, and reckless use of said instrumentalities and the negligent administration of said treatment in question by the defendants, their servants, etc., plaintiff sustained the injuries and damages herein complained of.''

The second count reiterates the allegations of the first count and in addition thereto alleges that "The defendants, their agents, etc., did not possess and exercise the degree of skill and learning ordinarily possessed and exercised under similar circumstances by members of their trade, calling, and profession, in good standing in the same general locality." In this count it was also alleged that the defendants "did not use and employ ordinary and reasonable care and diligence and accepted methods and their best judgment in administering the treatment in question. They submitted plaintiff to an excessive amount of said treatment; they did not secure and protect him against possible injury from said treatment; nor did they employ the usual and accepted means and methods of avoiding injury from the reactions which were to be normally expected from such treatment."

The last paragraph of this count reads as follows: "They were further negligent in that they failed and refused to use the usual, customary, and accepted methods of diagnosis to ascertain the true facts concerning the kind, character, nature and extent of plaintiff's injuries and to properly diagnose and treat same despite his repeated complaints and requests for care and attention; all of which greatly contributed to his pain and suffering and aggravated his injuries."

The defendant Dr. Cocke pleaded the general issue of not guilty. The defendant hospital moved the trial court to require the plaintiff to make his declaration more specific in many particulars. It is not important to specify them since the hospital is not now before the Court. For the same reason it is not necessary to state the nature of the pleas filed on its behalf. At the conclusion of the plaintiff's evidence, the trial judge, upon motion of the defendants, directed a verdict in their behalf. The

plaintiff, after his motion for a new trial had been overruled, prayed and was granted an appeal to the court of appeals as to the dismissal of his case against the defendant Dr. Cocke. He prayed no appeal from the action of the court in dismissing the case as to the hospital.

The sole question raised on this appeal is whether or not the rule of *res ipsa loquitur* applies. It plainly appears from the declaration and the admitted facts that the plaintiff could not hope to have his case submitted to the jury otherwise than upon the inference or presumption under the aforesaid rule *res ipsa loquitur*. The court of appeals in a divided opinion affirmed the trial court. The plaintiff has petitioned this Court for *certiorari* upon the theory that both the court of appeals and the trial court were in error in· ruling that the rule of *res ipsa loquitur* did not apply.

The only information we have as to the nature and extent of the shock treatment, as well as the method of administering it by Dr. Cocke and his assistants or attendants, is found in the testimony of the plaintiff. Mr. Quinley at the time of this treatment was about fifty-one years of age and had been employed as secretary for a number of years at Tech High School. He had been operated on for gall bladder trouble, as a result of which he became highly nervous. We infer from a reading of the entire record that his mind was affected. Acting upon the advice of his physician, he consulted Dr. E. W. Cocke who specialized in nervous and mental ailments. The plaintiff was asked:

"Q. What class of treatment was Dr. Cocke supposed to have administered to you? A. Electric shock treatment."

It is clear from the testimony of the plaintiff that he knew the purpose of the electric shock was to throw him

into a convulsion. He had been told about these shock treatments and he knew them to be very strenuous.

It appears there were no ill effects from the first treatment. The witness described the second treatment (and he had only two) by saying that as result of these shock treatments he received a violent electric shock. While the treatment is being given the patient is lying down on a "treatment pad" with his head in a downward position. A certain amount of electric current is caused to pass through the head and body, as result of which the patients becomes unconscious and remains so for several hours. Mr. Quinley was asked:

"Q. As soon as the treatment starts, you go out and you know nothing else until you finally wake up in your own room? A. Yes, sir."

Now according to his description, the electric device, from which the current passed into his body, was attached to his head. When asked what part the nurses and "negro porters" take in administering the treatment, he said, "They hold me." Evidently they hold the patient due to the fact that he is having violent convulsions.

When the plaintiff regained consciousness following this second treatment, he stated that he had a severe pain in the hip joint. This pain was due to a fracture of the hip. There can be no doubt but that this hip fracture resulted from the severe and repeated convulsions due to the electric shock.

At the conclusion of the plaintiff's evidence, counsel offered to read a stipulation as to what Dr. Edwin J. Lipscomb would say concerning the nature and method, as well as the result, of administering the electric shock; also the treatment he administered to secure a union of the fractured hip. This stipulation was objected to upon the ground that Dr. Lipscomb was not qualified to testify

as an expert on the method of giving the shock treatment. The stipulation shows the following: Dr. Lipscomb's specialty was that of an orthopedic surgeon and had been for thirty years; that during his experience he had occasion 'to treat two hip fractures resulting from shock treatment, one shoulder fracture, and had seen one spinal fracture, but did not give treatment therefor.'' It is further stipulated that the witness ''is familiar with and has knowledge of the literature and reports of the medical profession in reference to the administration of shock treatments and has talked with various specialists who give such treatments, and that *it is the witness' understanding and knowledge that fractures occur even with every precaution used to prevent them.''* (Italics ours.) It was further admitted that Dr. Lipscomb had never seen the treatment administered and ''knows nothing about the technique of his own personal knowledge.''

Mr. Farrar, addressing the court: ''But he is not qualified as an expert to give the shock treatment. I admit he is an expert.''

Mr. Armstrong, for the defendant, contended that, even though he had no personal knowledge of how the treatment is administered, he can give an opinion based upon his special knowledge of the subject which he has acquired from medical literature and other reliable sources. The trial judge permitted the stipulation to be read into the record. Following the introduction of the foregoing stipulation, the plaintiff read three written reports by Dr. Lipscomb, which was in lieu of his personal appearance and attendance upon court, regarding the nature of the plaintiff's injury and the treatment he gave him. In the last paragraph of the third report we find the following: ''As to prognosis: He is totally and permanently disabled. Since he not only has no union

in the hip, but is physically unable to get about even with the aid of crutches to any great degree."

It is insisted by counsel that error was committed in overruling the plaintiff's objection to the stipulation to the effect that Dr. Lipscomb's statement "was based upon hearsay evidence (referring to knowledge acquired from reading medical literature); that it was apparent that he had no personal knowledge of how the 'shock' treatments were administered and was not an expert in any respect with reference thereto." The question of when a witness is qualified to give expert testimony in a given case depends upon the extent of his knowledge of the subject about which he testifies. Even in cases where he is allowed to speak, and give an opinion as an expert, the jury is admonished that the probative value of what he says is determined by the extent of his learning, his experience or lack of it in the field of his particular calling or profession. The cases cited by counsel for plaintiff. *Ashby* v. *State,* 124 Tenn. 684, 139 S. W. 872, *Watson* v. *State,* 133 Tenn. 198, 180 S. W. 168, and *McElroy* v. *State,* 146 Tenn. 442, 242 S. W. 883, are not helpful in deciding the question now before us. In these cases counsel sought to qualify a general practitioner of medicine as an expert witness in the treatment of mental diseases. In the *Watson Case* it was said [133 Tenn. 198, 180 S. W. 169], "The examination of the witness clearly disclosed his lack of expert knowledge on the subject." In *Ashby* v. *State,* the experience of the doctors was very limited in treating mental diseases, etc. In *McElroy* v. *State, supra,* the doctors were examined in the presence of the court and held to be disqualified. In that case it was held (146 Tenn. at page 450, 242 S. W. at page 885): "Moreover, the qualification of a witness as an expert is a matter largely within the determination of the trial

court—a matter of discretion. This court will not reverse the ruling of the trial judge on such a matter, unless we can see he was clearly in error, unless there was an abuse of discretion." Citing cases. The evidence of these witnesses was excluded because they had no special knowledge of insanity and hence were not qualified to give the court and jury any light on the issue under consideration.

 Now the amount of education, or lack of it, or the experience of some doctor as shown in a reported case, is of little or no aid to the court in passing upon the qualification of a witness to give expert testimony as to the correct practice of the science of medicine and surgery in a given locality. What we have said is equally applicable to *Haskins* v. *Howard,* 159 Tenn., 86, 16 S. W. (2d) 20, where the Court expressed doubt as to whether a witness had qualified as a medical expert. We take it that no one will contend that a medical witness may testify and express an opinion based on declarations of nurses and doctors made out of court. "To qualify an expert witness in a malpractice action, it must appear that he is familiar with the treatment and care and skill of practitioners in the locality in question." 32 C. J. S., Evidence, sec. 537, p. 263. The foregoing is a statement of the general rule. "*The extent of the knowledge,* if sufficient knowledge is shown to render the testimony competent, affects only the weight of the testimony." 32 C. J. S., Evidence, sec. 545, p. 287. Now the plaintiff contends that Dr. Lipscomb was not familiar with the method of administering the shock treatment for nervous disorders, and that he acquired knowledge of such treatments and the result thereof from unreliable sources. We think the qualification of this witness rested within the sound discretion of the trial judge. It is clear from the

stipulation that he was a man of wide experience and knowledge in the field of orthopedic surgery, and was familiar with and had knowledge of the literature of the medical profession on the subject of shock treatments. The trial judge was justified in assuming that the literature referred to in the stipulation was such as the medical profession regarded as reliable authority on "Shock Therapy". "Neither is it necessary that he be familiar with the method of treatment employed in the particular case, that being a matter going to the weight, rather than to the competency, of the testimony." 32 C. J. S., Evidence, sec. 537, p. 263. See also 20 Am. Jur., Evidence, Sec. 865, and cases cited. The foregoing contention must be overruled.

■ ■ We will now consider the assignment of error that the trial judge committed error in holding that the rule *res ipsa loquitur* did not apply to the instant case and the court of appeals was also in error in affirming his judgment. This is a malpractice case growing out of a rather novel method of treating persons who are suffering from mental and nervous disorders. The plaintiff charges that the defendant had exclusive control of the electrical device which shocked him and that he would not have sustained the broken hip had the defendant exercised due care. It is upon this theory that he seeks to bring the case within the *res ipsa* rule. The doctrine here sought to be invoked does not ordinarily apply in malpractice cases, although this Court has held that it may apply in some exceptional cases, as in *Lewis* v. *Casenburg*, 157 Tenn. 187, 7 S. W. (2d) 808, where the plaintiff was severely injured by an X-ray burn, and in *Meadows* v. *Patterson*, 21 Tenn. App. 283, 109 S. W. (2d) 417, where the plaintiff was operated on for appendicitis and while he was unconscious his eye, which was in no way

involved in the operation, was injured. The doctrine is one of evidence and not of substantive law. "It is a common sense appraisal of the probative value of circumstantial evidence." 1 Shearman & Redfield on Negligence (Rev. Ed. 1941), p. 150, sec. 56. In the two cases above cited in which the rule was held to apply, there was a "common sense appraisal" of the facts and circumstances, the Court concluding that the X-ray burn in one case and the injury to the eye in the other justified the reasonable inference that these injuries resulted from negligence, there being no explanation as to the actual cause. While the courts have fully recognized the reason for refusing to apply the rule to malpractice cases generally, the exception is in those cases where "there is manifest such obvious gross want of care and skill as to afford, of itself, an almost conclusive inference [of negligence]." *Slimak* v. *Foster,* 106 Conn. 366, 370, 138 A. 153, 155, cited in Shain's Res Ipsa Loquitur, p. 468.

The doctrine has been applied in cases of an unusual injury, as where a plaintiff awoke from an anesthetic with her leg burned. *Meyer* v. *McNutt Hospital,* 173 Cal. 156, 159 P. 436. Also where a piece of patient's tongue was cut off in an operation for adenoids. *Evans* v. *Roberts,* 172 Iowa 653, 154 N. W. 923.

■ While the authorities are in conflict, we think the cases generally hold that *".res ipsa loquitur* applies where, during the performance of surgical or other skilled operations, an ulterior act or omission occurs, the judgment of which does not require scientific opinion to throw light upon the subject; while it would not apply in cases involving the diagnosis and scientific treatment." In other words, the rule will not apply in malpractice cases "where a scientific exposition of the subject matter is

essential." Shain's Res Ipsa Loquitur, pp. 468, 469, 470, and *Chubb* v. *Holmes*, 111 Conn. 482, 150 A. 516.

Now in the instant case the plaintiff introduced no evidence showing a lack of skill in administering the shock treatment, that he was given an excessive shock of electricity, or for an unusual length of time. There is no evidence to show that the treatment given differed in any way from that which is usual and customary by a skilful practitioner. In a situation of this kind there is manifest need of a "scientific exposition of the subject matter" for the court and jury to clearly understand the nature of the treatment, as well as the usual results that follow. The treatment is something new in medical science. It originated in Italy in 1938 and was first practiced in the United States in 1939 or 1940. Due to its very recent origin, all knowledge of the scientific application of the principle is necessarily limited to only a few experts.

Now under the stipulation Dr. Lipscomb, who is held to be qualified as an expert, although he may not possess all knowledge concerning it, says, from his knowledge of medical literature, that such fractures occur when the shock treatment is being given "even with every precaution used to prevent them." With this uncontradicted evidence before us, we are not warranted in supposing that it resulted from negligence on the part of the defendant. His statement is confirmed by a number of scientific journals filed with the record, dealing with "Electric and Shock Therapy in Personal Disorders", to-wit, The American Journal of Psychiatry, The Pennsylvania Medical Journal, The American Journal of Medical Sciences, and The Journal of the American Medical Association. We do not have before us the medical literature that was available to Dr. Lipscomb. While these periodicals minimize to a certain extent the danger of fractures to the

spine and other bones, the fact is fully established that, as a result of violent convulsions caused by this treatment, they sometimes do occur when the treatment is properly given.

In the light of the foregoing credible testimony, the Court would not be justified in submitting the issue of negligence to the jury.

The application of the *res ipsa* rule was considered by this Court in *Towle* v. *Phillips,* 180 Tenn. 121, 172 S. W. (2d) 806, where plaintiff's intestate was killed in an airplane accident. The issue raised was that the Court would not take judicial notice that airplanes do not fall in the absence of negligence. In other words, the Court did not know from common observation and experience that the fall of an airplane, if unexplained, creates an inference that it was due to negligence. In order to warrant the application of the doctrine in the instant case, the Court would have to take judicial notice that, as a matter of common knowledge and experience, fractures of the spine and other bones do not occur as the result of ''Shock Therapy'' in the absence of negligence. This we cannot do. The records before us, including the statement of Dr. Lipscomb, show that accidents such as the plaintiff sustained do occur even when the treatment is properly administered. It is not material that they occur often or infrequently. If we apply the rule of presumed negligence, *res ipsa loquitur,* in cases of this kind, the physician and surgeon would always be in fear of the result of a scientific treatment knowing that he might have to defend his professional reputation in open court. In these circumstances the words of Mr. Chief Justice TAFT (while on the United States Circuit Court of Appeals) are most appropriate: ''Few would be courageous

enough to practice the healing art." *Ewing* v. *Goode,* C.C., 78 F. 442, 443.

■■ It is next insisted that the trial judge erred in not submitting to the jury the question of defendants' negligence in failing to take an X-ray picture of his fractured hip; that he was entitled to recover damages for pain and suffering because.of his injury. The error is based upon the assumption that, had an X-ray picture been made when the plaintiff first complained of pain, proper steps could have been taken to alleviate the trouble. The only evidence in the record bearing upon this issue is the testimony of Dr. Lipscomb who stated that no harm resulted to plaintiff by the delay of three days before taking the X-ray picture. Moreover, it is well settled by all the authorities that a physician will not be adjudged guilty of negligence for error of judgment in making a diagnosis. The question was made in *Floyd* v. *Walls,* 26 Tenn. App. 151, 168 S. W. (2d) 602, and there held, "A physician's failure to take x-ray pictures of a fractured limb does not constitute neligence under all circumstances." The court said (26 Tenn. App. at page 165, 168 S. W. (2d) at page 607), "It was not a question for a jury of laymen to say whether under the facts of the particular case the defendants were guilty of negligence in failing to take X-ray pictures of plaintiff's back. That was a question to be determined upon the testimony of experts skilled in the treatment of such injuries." This authority is cited by the court of appeals and we think it is controlling on the question of negligence in failing to make a proper diagnosis.

We have given the most careful consideration to this case and, finding no error in the record, the writ of *certiorari* must be denied.