CARMEN ELADIA REYES ET AL., Plaintiffs and Appellees, *v.* PHOENIX ASSURANCE COMPANY and DR. HUGO RAMÍREZ TORRES, Defendants and Appellants.

No. R-71-123.     Decided October 16, 1972.

*Vicente Santori Coll* for appellants. *Román & Landrón* for appellees.

MR. JUSTICE MARTÍN delivered the opinion of the Court.

The main question which the present appeal poses is whether the death of minor María de los Angeles Rodríguez was caused by the negligence of a physician or of the personnel of the Borinquen Municipal Dispensary of Santurce, which belongs to the Municipality of San Juan. It also raises the question of the sufficiency of the evidence to show the damages suffered by plaintiffs.

The trial court clearly sets forth what happened in its findings of fact:

"1—On February 8, 1966, the 7-year-old girl María de los Angeles Rodríguez stumbled against another student in the yard of the school where she was attending the primary grades. Upon falling the minor remained stunned and was attended to by the school janitor, Miguel Resto Bermúdez, and by her mother who took the girl to school every day and picked her up. Upon falling, the girl was hit on the left side of the head at the level of the ear and she suffered a laceration in front of the same ear. The teacher administered first aid to her and ordered the mother to take the girl to the Borinquen Dispensary of Barrio Obrero. At that moment the girl was semistunned. The mother took a taxi and took the girl to the dispensary.

"2—After waiting for a while at the dispensary, the girl was taken by the nurse to the Emergency Room where Dr. Hugo Ramírez Torres attended to her. The physician examined the girl's ears with the otoscope without noticing hemorrhage in them. He also examined the girl's eyes with the said instrument, which may be converted into an ophthalmoscope, without noticing anything abnormal. He felt the cranium and could not notice any fracture. He also made the Babinski test with negative results. The physician believed that it was nothing serious, relying on the examination and his conversation with the mother,

yet, nevertheless, he warned the mother routinely that if she observed any vomiting or any unconsciousness in the girl to bring her again. He prescribed three penicillin doses to be administered on three consecutive days. The first dose was administered at that instant. The nurse treated the scratch in front of the ear with an antiseptic. No X-ray pictures of the cranium which would have discovered the fracture were taken, nor were the negative findings of the examination recorded. The evidence that the court had before it shows that that is the practice in public dispensaries. According to the testimony of defendant himself it is a deficient practice and plaintiff's medical expert thus classified it also. The mother took the girl home.

"3—At home the mother noticed that the girl was not well. She vomited that night. On the following day the mother took the girl to get the second shot; she told the nurse about the vomit and asked to see the physician but she was discouraged in her insistence by the dispensary's personnel and they only administered the shot. The net result was that because of the action and omission of the dispensary's personnel she could not see the physician. The court understands that the nurses in this second day did not perceive the seriousness of the situation as they should and could have perceived it and that those actions and omissions sealed the girl's fate.

"4—On the third day the girl vomited again. She was taken once more to the dispensary where another physician saw her and became alarmed. She was immediately taken to the hospital where X-ray pictures were taken which revealed that she had suffered a fracture of the cranium; it was already too late, the girl fell into a comatose state and she died a few hours later. The autopsy revealed that the cause of death of minor María de los Angeles Rodríguez was a hermorrhage in the epidural space whose hematoma produced compression on the left cerebral hemisphere. There were no findings of otorrhagia (hemorrhage in the ear) in the autopsy. There was no external evidence of the fracture. While alive it could have been discovered by taking good X-ray pictures. It was a question of a fracture by separation or dehiscence in the union of the parietal and the squama of the temporal. This fracture, according to the pathologist, prob-

ably caused the hemorrhage of the branch of the medial meningeal artery which is located in that place."

Based on the preceding findings of fact the court concluded that the negligence of the physician as well as that of the personnel of the dispensary (fixing in 50% the former's liability and 50% that of the latter) were the proximate cause of the minor's death.

Defendants Phoenix Assurance Company and Dr. Hugo Ramírez Torres[1] were ordered to pay to plaintiffs the following sums: $20,000 to Carmen Eladia Reyes, the minor's mother; $5,000 to Joaquín Rodríguez, Carmen Eladia's husband; $2,000 to Mrs. Enriqueta Rodríguez and to Mr. Alfonso Rodríguez, respectively, grandparents of the girl, and $2,000 for attorney's fees.

The trial court concluded, as a matter of law, that the physician's negligence consisted in the failure to take an X-ray picture of the girl when she arrived at the dispensary for the first time taking into consideration the stunning suffered by the girl in receiving the blow, which omission prevented the correct diagnosis; and upon not giving adequate instructions to the illiterate mother to impress on her the fatal consequences which could arise if she did not bring "insistently and by all means" to a physician's attention any episode of vomiting suffered by the girl.

As to the negligence of the dispensary personnel the trial court concluded, as a question of law, that their behavior was negligent upon discouraging or preventing the mother from taking the girl to the physician's office in the dispensary on

---

[1] The Municipality of San Juan was never sued in the case at bar. The attorneys of the said municipality, nevertheless, appeared in representation of codefendant Dr. Hugo Ramírez Torres for the claim that exceeds the amount of the policy issued by codefendant Phoenix Assurance Company even though there was an appearance of the attorneys of the municipality in representation of the latter, the same was subsequently withdrawn by the said attorneys, being the claim confirmed by a court order.

the following day, after the mother having explained that the girl had vomited on the previous night.

Defendants-appellants assign eight errors. The first five challenge the court's determination as to the negligence of the physician and the dispensary's personnel. The sixth and the seventh question the sufficiency of the evidence establishing the damages and the eighth assigns the impropriety of the sum fixed for attorney's fees.

Because the first five errors are interrelated we will discuss them jointly. We have sustained that in cases of professional medical liability a rebuttable presumption exists to the effect that the physician has exercised a degree of reasonable care and that the administration of the treatment to the patient has been adequate. The plaintiff is bound to present sufficient evidence to controvert this presumption and to that end the evidence must show something more than a mere possibility that the damage was due to the physician's failure to do his professional duty. If the evidence discloses more than one possible cause of the damage he cannot be adjudged liable unless the evidence as a whole shows that the negligent act for which he is liable is the most probable. *Rivera* v. *Commonwealth,* 99 P.R.R. 864 (1971); *Sáez* v. *Municipality,* 84 P.R.R. 515 (1962). The physician must have latitude in the exercise of reasonable judgment and he is not liable for an error of judgment unless the error is obvious or substantial according to the prevailing practice in the community. If the physician exercises due care and properly treats the patient upon diagnosis according to the accepted professional practices in the community, and acts according to the same, he incurs no liability even if his diagnosis proves to be a mistaken judgment. *Rivera* v. *Commonwealth, supra; Pérez* v. *Commonwealth,* 95 P.R.R. 728 (1968). This Court has already established that the professional practice in the community, or prevailing in the

community, when that term is used as a standard to measure the care exercised and the treatment administered in a specific case, does not mean the poor practice but the practice which complies with the acknowledged professional requirements, that is, the accepted practice professionally speaking. *Pérez* v. *Commonwealth, supra.* What constitutes an adequate professional practice is generally established through the testimony of medical experts. *Guzmán* v. *Silén,* 86 P.R.R. 504 (1962); *Rivera* v. *Dunscombe,* 73 P.R.R. 764 (1952). See: *Necessity of Expert Evidence to Support an Action for Malpractice against a Physician or Surgeon,* annotation in 81 A.L.R.2d 597.

Taking the foregoing general rules as a point of departure let us examine the conduct of the codefendant physician in the case under consideration. Dr. Ramírez made a diagnosis which later was found to be wrong. What actually turned out to be a cranial fracture according to the autopsy performed was diagnosed as a simple laceration by said physician. The general rule being that a physician is not liable for an error in diagnosis as long as he exercises the care and follows the rules of good professional practice accepted in the community, as we have stated above, the question before us boils down to determine whether according to the expert's evidence introduced, Dr. Ramírez followed the said professional practice in the evaluation and examination of the minor or whether on the contrary there was a deviation from the same.

Neurosurgeon Dr. Rafael Longo Cordero testified as plaintiffs' expert. The examination to which the said expert was submitted consisted mainly of a series of hypothetical questions based on the facts which the parties sought to prove. A great part of the facts concerning the girl's treatment by Dr. Ramírez which the trial court later considered as proved are contained in one of those hypothetical ques-

tions.[2] Relying on the facts which he was asked to assume, which as can be seen are substantially those which the court considered as proved, Dr. Longo concluded that there had been no deviation whatsoever from the adequate treatment to be administered to a patient in the state of the affected girl. The only element missing in the said hypothetical question and that obviously was of great weight in the determination of the trial court was the circumstance of the girl's "stunning."[3] We have carefully examined the transcript of evidence in this case and we must conclude that the record lacks any evidence whatsoever to show that the girl was stunned when she was examined by Dr. Ramírez.[4]

---

[2] In the said question Dr. Longo was asked the following: ". . . assume that this 7-year-old girl suffered a fall, suffered a blow on her head, did not suffer unconsciousness, she was taken during the morning to the medical dispensary, the physician sees her that morning at the dispensary, the girl is not confused, she does not complain of headache, . . . was not vomiting and did not have nausea, was acting normally in front of the physician. Her ear is examined with an otoscope and is normal, a reflexes examination is made with negative results, a pupil examination is made with negative results also, and then a laceration is noticed on the ear, it is washed, treatment is given for the wound, and she is sent home with her mother, who is warned that if the girl vomits, if she looks drowsy, has headaches, to immediately take her again to the dispensary. Assume that what is entered in the medical record is this information appearing on this page which I am showing you at this moment, that is the Medical Record at the Emergency Room, assume besides, doctor, that two days later the girl is taken to the Municipal Hospital in an emergent state, and unconscious, and that the girl dies as a result of an epidural hematoma, I ask you whether relying on that information, on those facts, whether in your opinion there has been a deviation from the adequate treatment to be administered to a patient in that state in which she was assisted.

"A. Relying on that no, there has not been any deviation."

[3] The court concluded that the girl was left stunned immediately after the blow but no determination is made whatsoever as to whether at the time that the physician saw her that condition existed. And, although it concludes that in view of the stunning of the girl X-ray pictures should have been taken, there is no evidence to support that finding.

[4] On the contrary, Dr. Ramírez testified that the mother had told him that the girl had not lost consciousness and that she was bringing the girl at the teacher's behest because she did not notice anything on her. Besides, the findings of fact of the trier are to the effect that "the

Dr. Longo himself indicated that despite the fact that the girl suffered the traumas which in effect she suffered, she should not necessarily present abnormal symptoms. Even more, a study of Dr. Longo's testimony as a whole shows that the stunning, contrary to unconsciousness, is not a controlling factor by itself in the diagnosis.

■■ It is proper to point out that the determination of negligence as a result of the omission to take X-ray pictures depends on the need thereof according to the circumstances of each case. See, *Floyd* v. *Walls*, 168 S.W.2d 602; *Bickford* v. *Lawson*, 81 P.2d 216; *Ross* v. *Hatchette*, 251 So.2d 820. It cannot be demanded that all blows on the head require that X-ray pictures be taken. The physician must have latitude within a reasonable limit. To those effects Dr. Longo was of the opinion that the physician should have discretion to decide whether the magnitude of the blow requires the use of X-ray pictures. Dr. Ramírez' testimony which was corroborated by the pathologist Dr. Juan Velázquez reveals that the girl did not show any external evidence of trauma except a skin laceration at the level of and immediately in front of the left ear. It was not until he opened the cavities that the pathologist found evidence of cranio-cerebral trauma, which was not palpable to the examination. The analysis of the evidence shows that there was no reason to take X-ray pictures, according to the condition which the girl presented upon being examined by Dr. Ramírez.

The expert's testimony, and especially the expert's answer to the hypothetical question to which we referred before revealed that the warnings made to the minor's mother by the physician were the proper ones.

In view of the preceding analysis we decide that the conclusion of the trial court to the effect that Dr. Ramírez

---

physician understood that nothing serious was involved, based on the examination and the conversation which he had with the mother."

was negligent in the treatment given to the girl María de los Angeles Rodríguez is not supported by the evidence presented.

Even though Dr. Ramírez did not incur negligence upon examining and making the diagnosis of the patient, it is advisable to point out that his omission to make the due annotations in the patient's record as to the result of the several tests which he performed and as to the warnings he gave to the girl's mother concerning the symptoms which she should watch worries us. We agree with the medical expert in that the making of such annotations in the record for the benefit of any other physician who may be called to intervene in the case later on is a good practice. In that manner the trajectory of the ailment or illness may be followed, expediting the evaluation of the changes which may have occurred between one examination and the other. As a result of this the patient is protected.

Even though the lack of said annotations in the record does not necessarily constitute negligence per se, said omission may be a factor to be considered in the credibility which the court may deem that the physician deserves regarding the treatment given to the patient. The medical class may protect itself against some unjustified actions with a complete and adequate medical record.

Because of the importance which it has it seems proper to us to indicate that the pertinent entities should make an effort so that the records of hospitals and dispensaries be kept in a uniform manner and that the tests and examinations which the physicians practice as well as the results of the same, even if negative, as well as the warnings or observations made to patients or relatives be recorded in the same. It may be as important as the treatment to which the patients are submitted. As to the contents of medical records and as to the need that the same be adequately kept, see: Hayt & Hayt, *Legal Aspects of Medical Records* 1,

chap. 1, 1964; University of Pittsburgh, Health Law Center, *Hospital Law Manual, Medical Records* 1; Chayet, *Legal Implications of Emergency Care* 54, 1969; I Louisell and Williams, *Medical Malpractice* 183 *et seq.*

■ What has been said does not dispose of this appeal. The alleged negligence of the other dispensary employees remains to be determined. It appears from the testimony given by the girl's mother and from the findings of fact of the court that after seeing Dr. Ramírez the girl vomited that night. On the following day the mother took the girl to the Borinquen Medical Dispensary so that they would administer the second shot which Dr. Ramírez had prescribed and she informed the nurses that her daughter had vomited. From her testimony it does not clearly emerge that she insisted on seeing the physician. Neither does it appear that she called the nurses' attention to the fact that the physician had warned her of the importance of the vomits, but on the contrary she alleges that the physician had not made any warnings whatsoever to her. Neither did the medical record contain any indication whatsoever that the girl's condition could be invested with any seriousness. On the contrary, the record showed that the girl had just had a laceration of which she was cured, and because of that the physician suggested an antitetanic shot and three doses of penicillin. There was nothing in the record to alert the nurses. There is no evidence, either, that the girl on that second day showed any abnormality. The vagueness of the girl's mother's testimony in the sense that they did not allow her to pass to see the physician, together with the fact that the allegations of the complaint charge negligence to the physician exclusively, weaken the position of the plaintiffs who are compelled to prove their case by the preponderance of the evidence. In our opinion no negligence on the nurses' part was proved.

Despite the conclusion which we have reached, we avail ourselves of the occasion which this case presents to us to

advise the nurses that render services at the dispensaries or hospitals that they should not attribute to themselves the physicians' powers. We are compelled to censure the practice of those who assume said powers at the latter's back. Their duty towards the patient and with the physician is to call the latter's attention as to the patient's symptoms and complaints. Patients deserve the painstaking and responsible care of the nurses of said institutions. On many occasions the nurse is the only means of communication between the physician and the patient. It cannot be permitted that the patient remain exclusively at the mercy of the nurses' whims or desires.

In view of the conclusions which we have reached we need not consider the other errors assigned by plaintiffs.

The judgment appealed from will be reversed in all its parts.

Mr. Justice Hernández Matos dissented. Mr. Justice Torres Rigual concurred in the result.