Dr. Max Hughes, Appellant,

*v.*

Carl R. Hastings, Appellee

469 S.W.2d 378

(*Jackson,* April Term, 1971.)

Opinion filed June 7, 1971.

Fred E. Ivy, Jr., Nelson, Norvell, Wilson, McRae, Ivy & Farmer, Memphis, for appellant.

Hearn W. Tidwell, Lester F. Lit, Memphis, for appellee.

MR. JUSTICE CRESON delivered the opinion of the Court.

This cause is before this Court on petition for certiorari heretofore granted.

In the course of this opinion, the parties will be referred to as they appeared in the trial court; that is, Carl R. Hastings as plaintiff, and Dr. Max Hughes as defendant.

This is the second time this case has come before this Court. The first was in November, 1968, on petition for certiorari to review judgment of the Court of Appeals. The Court reversed judgment of the Circuit Court of Shelby County in favor of defendant, by direction of the court, and remanded the case for new trial. This Court denied certiorari.

This case originated in October, 1966, upon a declaration filed by plaintiff, Carl Hastings, alleging three acts of negligence in one count and res ipsa loquitur in a sec-

388

ond count. Upon trial, the court directed a verdict for defendant, Max Hughes, at the end of all proof. On appeal, Judge Lois Bejach, writing for the Court of Appeals in the reported decision of *Hastings v. Hughes* (1968), 59 Tenn.App. 98, 438 S.W.2d 349, reversed and remanded on the ground that the evidence presented questions for the jury as to whether defendant fell below the standard of care of a physician practicing anesthesiology in Memphis, Tennessee.

The testimony becomes a vital factor as to the applicability or non-applicability of the doctrine of res ipsa loquitur. Therefore, considerable attention will be given it in this opinion.

Plaintiff's proof in chief revealed the following facts:

In the afternoon of October 25, 1965, about 2:30 P.M., plaintiff was admitted to St. Joseph Hospital for an exploratory lumbar laminectomy recommended by his personal physician, Dr. Peter B. Wallace. On the following morning, October 26, 1965, plaintiff was given a preoperative injection by a nurse to make him "woozy" or "drunk", and instructed to inform the doctors in the operating room that he, plaintiff, had three capped teeth. Upon being wheeled into the operative suite, plaintiff was met by Dr. Wallace and introduced for the first time to defendant, Dr. Max Hughes. Plaintiff was told that Dr. Hughes was an anesthesiologist, and would administer the anesthesia. Plaintiff was then told by Dr. Wallace that he was to receive local anesthesia, called a "spinal". Plaintiff refused to be given a "spinal", and demanded to be put to sleep. After futile efforts to convince plaintiff of the advantages of local anesthesia, Dr. Hughes agreed to give plaintiff a "general"; that is, put him to sleep.

Plaintiff's testimony is that he had never seen Dr. Hughes before the morning of October 26, 1965, in the operating room; that defendant did not examine his mouth and teeth before administering the anesthesia; that the last thing he, plaintiff, remembered before being put to sleep from an injection of sodium pentothal was telling defendant to "watch my teeth, because they had caps on them * * *"; and that when he later waked up in the recovery room, he was given a jar with the pieces of tooth in it and told by some hospital attendant or intern that one of his teeth had been broken and a second cracked by accident. Further testimony by plaintiff was that he knew nothing about how his teeth were broken and damaged; that he was completely unconscious during his operation; and that as a result he has suffered considerable pain and discomfort, and incurred sizeable dental and drug expense.

Other proof by plaintiff was the testimony of Mrs. Mary Williams, the medical records librarian at St. Joseph Hospital, and testimony of plaintiff's wife. Mrs. Williams verified plaintiff's entry into the hospital and subsequent admission to surgery, as aforementioned, and further testified to the contents of two progress reports signed by Dr. Hughes stating the cause of the accident resulting in damage to plaintiff's teeth. Plaintiff did not introduce expert testimony on his behalf, nor did he introduce any evidence to support the first count of his declaration, based upon specific allegations of negligence.

Cross-examination revealed that plaintiff had three capped teeth. The two that were damaged were the upper left and upper right front incisors. The left incisor had been devitalized; that is, a hole had been drilled up inside the back of his tooth, and nerves and blood vessels re-

moved. The hole was plugged with a metal pin or "peg", and this "peg", together with a small portion of the tooth remaining below the gum line, was covered by a porcelain cap. On the back of this tooth, near the gum line, was a very small gold inlay. The right incisor was not devitalized, but had been ground down and covered with a porcelain cap. The caps were held in place by cement. Plaintiff stated further that the two upper front incisors had been capped for about a year; that although he could eat most anything he wanted, close examination would reveal that the teeth were capped; but that the peg in the left front incisor was hidden, and could not be seen nor felt.

Testimony of Mrs. Carl Hastings on cross-examination was that before plaintiff's operation his teeth looked normal; that they looked like regular teeth.

At the end of plaintiff's proof, defendant moved for a directed verdict. The motion was denied.

Defendant's proof consisted of the testimony of defendant and his expert witness, Dr. William C. North. The testimony of Dr. Hughes was a detailed outline of the standard of care of a practicing anesthesiologist in Memphis, Tennessee; of the procedures used by him in administering general anesthesia to plaintiff; and an explanation of the cause of the accident resulting in damage to plaintiff's teeth.

Dr. Hughes testified that it is his habit after surgery every day, between 4:00 P.M. and 6:00 P.M., to check the surgeon's schedule for the names of patients to be admitted to surgery on the next day; that he then goes to the room of each patient, studies his chart for everything pertaining to lab work and/or medication, reads

notes made by the nurse, and talks to the patient about his general physical condition; that he checks with the patient about previous surgery, previous anesthesia, contact lenses, dental work, etc.; and that this routine is the standard procedure used by most anesthesiologists in Memphis. Defendant further testified that he did not examine plaintiff on October 25, 1965, the day before his surgery, because plaintiff's name had not been placed on the surgeon's schedule; that he did not know that plaintiff was scheduled for surgery until 10:00 A.M. on the morning of October 26, 1965, when he was informed of that fact by a nurse in surgery; that he, defendant, was in surgery all morning on October 26, 1965; and that he did not see plaintiff at all until approximately 1:15 P.M. on October 26, 1965, when plaintiff was brought into the operative suite.

Defendant testified that when plaintiff arrived in surgery he was woozy from a light pre-operative injection of atropine and demerol; that plaintiff demanded general anesthesia instead of a "spinal", and he, defendant, and Dr. Wallace, consented; that he read plaintiff's chart to which was attached a surgical check list prepared by the nurse in plaintiff's room, and which listed all medication given to plaintiff and other information concerning false teeth, glasses, artificial limbs, etc.; that plaintiff's chart showed none of these; and that he, defendant, proceeded to put plaintiff to sleep.

Dr. Hughes stated that he lifted plaintiff's lips and "casually and routinely" looked at the front upper and lower teeth; that he saw nothing to cause him concern or to warrant a more detailed examination of plaintiff's mouth and teeth; and that he then proceeded to administer anesthesia. First, a shot of sodium pentothal rendered

392

plaintiff unconscious. Secondly, a muscle relaxant solution called anectine was administered intraveneously to make plaintiff completely flaccid. Thirdly, Dr. Hughes inserted an endotracheal tube in the plaintiff's throat, through his vocal cords, and into the trachea. Defendant explained that this was done with the aid of a laryngoscope, an instrument with a light on it that is inserted into the throat to put light on the vocal cords so that the endotracheal tube can be safely guided through them. A small balloon on the end of the endotracheal tube was inflated with 4 cc of air to make the tube fit snugly in the trachea, and prevent saliva from flowing into the lungs or gas from escaping up through the mouth. Dr. Hughes then inserted a plastic airway into plaintiff's mouth and over the base of his tongue to hold the tongue up. The airway and endotracheal tube were taped together and both taped to plaintiff's cheek to hold them in place. After the endotracheal tube was inserted into plaintiff's trachea, it was attached to a "gas machine" which defendant used to breathe for plaintiff. Dr. Hughes explained that the gas machine was calibrated to administer to plaintiff anesthesia composed of 98 per cent oxygen and 1½ to 2 per cent fluorthane.

Dr. Hughes explained that for the type of back surgery that plaintiff had, it was necessary that Mr. Hastings be nearly 100 per cent relaxed; that the anectine and fluorthane drugs were continuously administered in order to maintain that condition; that while in that condition plaintiff's respiratory system was completely arrested and the only thing functioning was his heart; and that since plaintiff was face down on the operating table, the plastic airway was necessary to (1) prevent the tongue from obstructing the air passage, and (2) to prevent

plaintiff from biting down on the plastic endotracheal tube, thereby cutting off his air supply.

Dr. Hughes testified that the surgery went fine, and that about 10 to 15 minutes before Dr. Wallace finished suturing the skin and applying a dressing, he, defendant, cut off the flow of anectine for the purpose of getting Mr. Hastings to begin breathing on his own. When Dr. Wallace finished and left the operating room, plaintiff was put into the care of defendant. Dr. Hughes testified that plaintiff was still face down, so he and a group of nurses and orderlies turned plaintiff over and laid him on a recovery room stretcher; that he then removed the tape binding the plastic airway and endotracheal tube together, and disconnected the gas machine, because plaintiff was breathing well; and that he aspirated plaintiff's mouth and throat and removed the endotracheal tube. Defendant testified further that he then listened closely to plaintiff's breathing for 30 to 60 seconds for the purpose of making sure that there was no obstruction in his air passage, and that it was clear; that while he was listening and before plaintiff was removed to the recovery room, Mr. Hastings suddenly bit down hard on the plastic airway still in his mouth and throat, breaking into pieces one tooth and cracking another; and that it happened so quickly that he could do nothing to stop it.

"The first thing you do when you go to sleep is relax, and the first thing you do when you wake up is clamp down on the muscles of the body.

Mr. Hastings just that quick (snapping fingers) just bit down on this airway, and before I could do anything, the tooth just disintegrated and went into pieces. I took the pieces of tooth out."

Dr. Hughes explained that the plastic airway was kept in plaintiff's mouth and throat because plaintiff, although breathing on his own, was still unconscious; that it was imperative that plaintiff's tongue be kept up and away from his air passage; and that this procedure was standard. In fact, defendant testified that ordinarily an airway was left in a patient's mouth until the patient either spit it out or gagged on it, because either of those occurrences was an assurance that the patient was awake and in control of his breathing. Defendant explained further that he was with plaintiff when the accident occurred; that he inspected plaintiff's mouth and removed all tooth fragments; that he noted on plaintiff's chart that a tooth had been broken as a result of plaintiff biting the airway due to a reaction of the masseter muscles in the jaw.

Defendant further testified that all the instruments he used in administering general anesthesia to plaintiff were customarily used in Memphis; that the use of anectine is a matter of choice, but is used by four out of five anesthesiologists; that the fluorthane gas machine is widely used in Memphis, and the most proper machine available; that he looked at plaintiff's teeth before starting the anesthesia, but saw nothing to cause him concern; that he had no knowledge of a devitalized tooth; that there is no way a physician can anticipate when a patient will react and bite down on the airway; and that such a reaction of the masseter muscles can occur regardless of the care, skill and caution of an anesthesiologist.

Dr. William C. North, who at time of trial was chairman of the department of anesthesiology at the University of Tennessee, and a practicing anesthesiologist, testified on direct examination to the standard of care

of an anesthesiologist in Memphis, Tennessee. Dr. North was shown various instruments used by defendant, and testified that they were the standard and prescribed equipment used in Memphis to administer general anesthesia. Dr. North was shown two types of airways and testified that the plastic one used by Dr. Hughes was more commonly used. Dr. North testified as to how the airway was used and why. Dr. North testified further that the drugs anectine and fluorthane used by defendant were standard drugs administered during general anesthesia. In short, there were no material discrepancies between Dr. North's testimony and that of defendant. Upon being questioned by defendant's counsel on a hypothetical question describing the procedures used by Dr. Hughes, Dr. North stated his opinion that said procedure was the "* * * routine and accepted anesthesia procedure * * * used by a considerable number of physicians and anesthesiologists of good standing, trained and experienced in this community." Further, Dr. North was of opinion that the reaction of the masseter muscle causing a patient to bite the airway, breaking teeth, could occur regardless of the care and skill exercised by an anesthesiologist.

On cross-examination of Dr. Hughes, and his expert witness, Dr. William C. North, plaintiff's counsel attempted to show the court and jury three specific acts or theories of negligence. First, that defendant failed to make inquiry or examine plaintiff's teeth both before administering anesthesia and afterwards; secondly, that defendant failed to use certain precautions to avoid breaking plaintiff's teeth; and thirdly, that defendant failed to exercise due care as required of a physician administering general anesthesia in Memphis, Tennes-

see. Plaintiff's counsel showed some alleged discrepancies between defendant's testimony on direct, and his testimony at the first trial with regard to examination of plaintiff's teeth. Plaintiff tried to show that had a rubber mouth guard been placed over plaintiff's front teeth, or if rubber ''bite blocks'' had been placed in the rear of plaintiff's mouth between his teeth, the accident would not have happened. Both defendant and Dr. North discredited these methods, and testified that neither of these methods were used by anesthesiologists in Memphis.

At the conclusion of all the evidence, and before the court's charge to the jury, there was considerable argument, absent the jury, about the applicability of res ipsa loquitur. The trial court concluded that although plaintiff had alleged res ipsa loquitur and had relied upon the doctrine in his proof in chief, defendant's explanation of the accident, coupled with plaintiff's attempt to show acts of negligence, destroyed the applicability of res ipsa loquitur, relying upon *Ross v. Griggs* (1955), 41 Tenn. App. 491, 296 S.W.2d 641, and *Wooten v. Curry* (1962), 50 Tenn.App. 549, 362 S.W.2d 820.

The court, therefore, did not charge res ipsa loquitur, but submitted to the jury plaintiff's three theories of negligence, as aforementioned.

The jury returned a verdict for defendant, Dr. Max Hughes. The Court of Appeals reversed and remanded the case for a third trial. That Court was of opinion that the trial court should have charged res ipsa loquitur for the reasons that at the close of all the evidence the proximate cause of plaintiff's injury did not clearly appear; that there was basis for difference among reasonable

minds as to the proximate cause; and that defendant's proof did not clearly show a lack of negligence. The Court concluded that where plaintiff's proof failed to establish acts of negligence, a jury should be informed why they have the case for consideration; and that such could best be accomplished by a proper charge of res ipsa loquitur.

Defendant's assignments of error in this Court present, primarily, one question; that is, whether the doctrine of res ipsa loquitur is applicable to the case at bar?

The law of the doctrine of res ipsa loquitur has been often stated in the reported decisions of Tennessee appellate courts and this Court. Also, its proper application in medical malpractice cases has been carefully enunciated. It would be no more than mere supererogation to again belabor the rationale of these various decisions. The function of the doctrine, its limitations and its consequences in cases of the nature of the case at bar are adequately stated in *Poor Sisters of St. Francis v. Long* (1950), 190 Tenn. 434, 230 S.W.2d 659, and *Wooten v. Curry* (1962), 50 Tenn.App. 549, 362 S.W.2d 820, and the authorities cited therein. Suffice it to say we have again thoroughly reviewed medical malpractice decisions in this state; and are convinced that res ipsa loquitur cannot be given application in this case. The reasons are twofold—(1) that evidence was offered at the trial of a specific act or acts of negligence; and (2) this record is abundantly clear that what occurred in the instant case could not be prevented by any technique known to and recognized by the medical profession. Compare *Quinley v. Cocke* (1946), 183 Tenn. 428, 192 S.W.2d 992. It is equally apparent that all plaintiff's theories of negligence were submitted to the jury by the

trial court and rejected by that body which, as stated, returned a verdict in favor of defendant Hughes.

The result is that the judgment of the Court of Appeals is reversed; and that of the trial court affirmed. The costs are assessed against Carl R. Hastings.

DYER, CHIEF JUSTICE, and CHATTIN, HUMPHREYS and McCANLESS, JUSTICES, concur.

## OPINION ON PETITION TO REHEAR

MR. JUSTICE CRESON.

In this case we have been presented a petition to rehear filed on behalf of Carl R. Hastings. Upon consideration we find that this petition constitutes no more than a reargument of those things considered and determined in the original opinion.

Clearly, the above does not conform to the objective purposes of petitions to rehear as enunciated in Rule 32 of the rules of this Court. After consideration, we are of opinion that the petition should be, and the same is denied.

DYER, CHIEF JUSTICE, and CHATTIN, HUMPHREYS and McCANLESS, JUSTICES, concur.