IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 8, 2011 Session

**KIMBERLY L. SMITH v. GARY E. MILLS, M.D., ET AL.**

**Appeal from the Circuit Court for Hamilton County**
**No. 07-C-298     W. Neil Thomas, III, Judge**

**No. E2010-01506-COA-R3-CV-FILED-OCTOBER 4, 2011**

This is an appeal from a jury verdict in a medical malpractice case. The jury entered a judgment in favor of the defendants. The plaintiff has appealed. We affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Jimmy W. Bilbo, Cleveland, Tennessee, for the appellant, Kimberly L. Smith.

F. Laurens Brock and Nathaniel S. Goggans, Chattanooga, Tennessee, for the appellees, Gary E. Mills, M.D. and Beacon Health Alliance, P.C.

**OPINION**

**I. BACKGROUND**

Throughout late 2005 and early 2006, the defendants, Gary E. Mills, M.D., and Beacon Health Alliance, P.C. ("Beacon") (collectively "Defendants") provided prenatal care to the plaintiff, Kimberly L. Smith ("Patient" or "Ms. Smith"). On February 23, 2006, Patient was admitted to Erlanger Medical Center ("Erlanger") for a vaginal delivery and a subsequent tubal ligation. After a successful delivery, Dr. Mills performed the tubal ligation, and, while closing the incision, he stitched a portion of Patient's bowel to her abdominal wall.

Not long after her surgery, Patient began to experience pain in her abdomen. Less than two days after surgery, Dr. Mills determined that Patient had suffered a bowel obstruction during surgery. Accordingly, on February 26, 2006, Patient underwent an exploratory laparotomy and had several centimeters of her small bowel extracted—the first of several subsequent surgeries to repair the resulting damage.

On February 22, 2007, Patient filed her complaint alleging that Defendants had committed medical malpractice when Dr. Mills stitched her bowel to her fascia.[1] The case proceeded to trial in April 2008. Patient called Dr. Barry Wolk, a general obstetrician and gynecologist from Athens, Georgia, as her first witness. The relevant portion of Dr. Wolk's testimony occurred during cross-examination:

Q       Doctor, you agree the fact that a stitch to the bowel has occurred during the closing of the fascia does not mean there is negligence just by that information alone, correct?

A       Are we talking about this case?

Q       Generally. Generally, Doctor, the fact that a stitch to the bowel has occurred during the closing of the fascia does not mean there is negligence just by that information alone, correct?

A       I think I said earlier that there can be extenuating circumstances of the patient having cancer or other diseases along with it. But in my view, stitching the bowel to the fascia during a closure of a benign surgery is beneath the standard of care. That's why I'm here.

Q       I've heard that. You're calling it benign and all of that.

A       Right.

Q       But the question is: The fact that the stitch to the bowel has occurred during the closing of the fascia does not mean there is negligence by that information alone?

A       Sir, it is my opinion that a reasonable surgeon in a similar situation exercising ordinary care would not stitch the bowel to the fascia.

---

[1]According to the testimony, the fascia is the white layer below the fat and above the peritoneum layer that lines the inside of the abdomen.

Therefore, if the bowel is stitched to the fascia, unless there is some extenuating circumstance that I'm not familiar with, it would be negligent or beneath the standard of care.

Q    Sir, do you recall on Page 14 of your deposition when I asked you the question:

"QUESTION: I'm talking just generally, the fact that a injury – a stitch to the bowel has occurred during the closing – closing of the fascia does not mean 100 percent that there is negligence, just by that information alone?"

"ANSWER: I'll agree – 100 percent, I'll agree."

A    Well, by that information alone and the word generally, I do agree.

Q    All right. So you do agree?

A    Okay. Fine.

Q    Thank you. And, Doctor, complications from tubal ligation surgery can also include inadvertent injury of the adjacent structures including the bowel, correct?

A    Correct.

During re-direct, Dr. Wolk testified as follows:

Q    But my question to you is this as it relates to the injury that Kimberly Smith received from putting the stitch through the bowel, and this is the question: Is putting the stitch through the bowel while closing the fascia after an open surgical procedure at the umbilicus area, would putting the stitch through the bowel occur in the absence of negligence?

A    I don't believe so.

Dr. Wolk further testified that "[i]t's my opinion that encompassing the bowel or grabbing the bowel with the stitch during the closure of an incision like this would not meet the

standard of care." Nevertheless, Dr. Wolk also acknowledged that stitching the bowel during the closing of the fascia is "a statistical complication."

At the close of Patient's case, Defendants moved for a directed verdict on both the issues of liability and Patient's alternative theory of res ipsa loquitur. The motion for the directed verdict as to liability was quickly overruled; however, the trial court took the res ipsa issue under advisement, but later granted the motion on the ground that a res ipsa jury charge was inappropriate in this case because the jury had been presented with a "battle of the experts," and the jurors should "decide which expert they want to believe."

When Defendants began putting on their proof, two experts were called. Dr. Alexander Burnett, a board certified obstetrician, gynecologist, and gynecologic oncologist from Little Rock, Arkansas, testified that Dr. Mills did not provide substandard care to Patient and that Ms. Smith's injury is a recognized statistical complication of closing the fascia. Dr. Burnett also related that inserting a stitch into the bowel can be inadvertent and can occur for reasons that are beyond a surgeon's control. He discussed the following possible scenarios:

Q      Doctor . . . the jury wants to know why is it when you're closing the fascia that you may catch an inadvertent stitch of the bowel?

A      There are a couple of different scenarios that can occur that may have caused this. One is this is a woman who has had multiple surgeries, and it has been documented to have -- some of the surgeries of having a fair amount of scar tissue down in the pelvis.

Now, it may be that a portion of the small intestine has become scarred just below the fascia. So one of the possibilities is while the belly button is about here, and this is where you're going to be closing the fascia, it could be that as you close the fascia the small bowel stuck to it so intimately that one can't even tell whether it's there or not. So that's a possibility.

The other possibility is for this type of surgery the patient is awake. It's done under epidural. And when you're awake, any kind of movement that increases the pressure on the abdomen will get things to move around, and they can move around quite quickly; if you cough or sneeze, sometimes under epidural people will vomit, even if you laugh. Any of those things can cause a sudden change in the abdominal pressure where the intestines could pop right up against the wound.

-4-

So that's another possibility, that one could be completing the closure and even a fairly subtle movement could cause the intestine to come up into the area where the stitch is going to be.

* * *

Q       Why is it that then that bowel might still get there even though you're watching as you close or do the final closing of the stitch?

A       Well, there could be several reasons. Again, if there is a -- if the bowel is adherent and it's adherent in such a manner that it's very -- it's just a very thin piece of bowel that's adherent there, one could look directly at it and not say -- not tell for certain that that's small bowel. It could [look] everything like the peritoneal lining.

In addition, on the final stitches, you know, are you seeing the needle 100 percent of the time as it's going through? No. By necessity, you're not going to see it 100 percent of the time. You do everything in the world to carefully place that stitch so that it wouldn't inadvertently catch something you don't want to catch, but that's always a possibility.

Q       And that could be the case even if the surgeon puts whatever finger in and swipes around and makes sure that it's clear, and look, and it can still happen?

A       It could still happen. If it's a thin adhesion, you could put your finger around there and not feel this.


Dr. Mills's other expert, Dr. Thomas Stovall – an obstetrician and gynecologist from Memphis – also testified at trial. The relevant portions of Dr. Stovall's testimony are as follows:

Q       Okay. All right. Have you ever been to Erlanger Hospital?

A       Yes.

Q       For what purpose?

A       I was invited there to give what's called grand rounds, or it's a teaching

conference for the residents on a couple of occasions.

Q    Have you actually taught obstetricians and gynecologists who are practicing here in Chattanooga currently?

A    Yes.

Q    Have you worked on projects throughout the State of Tennessee that are funded by the State of Tennessee relative to medical care for residents in Tennessee?

A    Yes.

* * *

Q    Have you looked at information and are familiar from coming here to Erlanger Hospital in Chattanooga to compare whether the standard of care for obstetricians and gynecologists is similar in Memphis as it is here in Chattanooga?

A    Yes, I believe it is.

Q    And what's the basis of that opinion?

A    Well, number one, I looked at the medical records, and so I know that the type of procedure that was done, the way it was done, the training of the person who did it, the ancillary personnel is very similar to what I use in Memphis.

Obviously, I have been to Chattanooga. I have given lectures here. I have trained residents who practice here. I have had medical students who – actually, Erlanger accepts medical students from the University of Tennessee in Memphis, and so we have medical students who actually train over here.

I'm in societies with physicians who practice in Chattanooga. So I guess all of that together sort of makes me familiar with what the standard of care is in Chattanooga and Memphis.

* * *

Q    Doctor, does Memphis – from your review of materials and knowledge, are Chattanooga and Memphis similar communities from your evaluation and review of materials, similar for the purpose of the standard of care?

A    I'm not sure I understand that question.

Q    . . . Does Memphis – you're familiar with the hospitals like – which hospitals do you have privileges in Memphis?

A    We have two major hospital systems, the Baptist versus the Methodist.

Q    Okay.

* * *

Q    Do they have the same level – Erlanger, you're aware, is a high level trauma hospital?

A    Yes.

Q    Are there high level trauma hospitals in Memphis?

A    We would describe those as being tertiary care medical centers.

Q    All right.

A    And basically what that means is that Erlanger is a tertiary medical care center. It has – first of all, it has a level one trauma center, which is one of two in the eastern part of the state. It has a neonatal intensive care unit. It has 24-hour in-house anesthesia. It has all of the sub-specialties of medicine represented. And that's virtually identical to the hospitals, to the Baptist system and to the Methodist system.

* * *

Q    Sir, are you aware of the sizes of the cities, roughly, their populations or there [sic] different sizes? I mean, you're aware of that difference, correct?

A      Yes. I believe that Chattanooga, Hamilton County has about 200,000 residents. Memphis has – Memphis proper has about 650,000. With total combined, it has about 800,000.

The two communities are different and similar. They are similar in that we both have tertiary care medical centers. We have all the specialties of physicians represented. . . .

\* \* \*

Q      Doctor: Based upon –

A      I mean, you have pretty much everything that Memphis has.

Q      Okay. Based upon your clinical practice, your experience from visiting this community, teaching in this community, based upon the services for providing obstetrics and gynecology in Chattanooga and Memphis, do you believe that they are similar communities for – similar communities for the purposes of the delivery of care?

A      Yes.

Dr. Stovall further opined that based on his education, training and experience, Dr. Mills did not provide substandard care to Patient and that stitching the bowel during the closure of the fascia is a known complication of any tubal ligation surgery.

The jury returned a verdict for Defendants, and on April 26, 2010, a final judgment was entered to that effect. After the trial court overruled her motion for a new trial, Patient timely filed this appeal.

## II. ISSUES

Ms. Smith raises the following five issues on appeal:

A. Whether the trial court erred in admitting the testimony of defense expert Dr. Stovall in light of the locality rule found in Tenn. Code Ann. § 29-26-115(b)?

B. Whether the trial court erred in denying Patient's request to charge the jury

on a res ipsa loquitur theory of negligence under Tenn. Code Ann. § 29-26-115(c)?

C.  Whether the trial court erred in restricting evidence of medical treatment expenses to amounts paid to providers in light of Tennessee's modified collateral source rule found in Tenn. Code Ann. § 29-26-119?

D.  Whether the trial court erred by prohibiting Patient from arguing a specific dollar amount for damages in her closing argument?

E.  Whether the jury's verdict is against the weight of the evidence presented at trial?


## III.  STANDARD OF REVIEW

Our review of a judgment based upon a jury verdict is governed by Tenn. R. App. P. 13(d).  Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict.


## IV.  DISCUSSION

Medical malpractice claims are a specialized type of negligence action.  Such actions in this state are controlled by the medical malpractice statute, Tenn. Code Ann. § 29-26-115, which requires that the plaintiff prove:  (1) the recognized standard of professional care; (2) that the defendant failed to act in accordance with the applicable standard of care; and (3) that as a proximate result of the defendant's negligent act or omission, the plaintiff suffered an injury which otherwise would not have occurred.  Tenn. Code Ann. § 29-26-115 specifically provides as follows:

(a)  In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and

reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection when it determines that the appropriate witnesses otherwise would not be available.

(c) In a malpractice action as described in subsection (a), there shall be no presumption of negligence on the part of the defendant; provided, there shall be a rebuttable presumption that the defendant was negligent where it is shown by the proof that the instrumentality causing injury was in the defendant's (or defendants') exclusive control and that the accident or injury was one which ordinarily doesn't occur in the absence of negligence.

(d) In a malpractice action as described in subsection (a), the jury shall be instructed that the claimant has the burden of proving, by a preponderance of the evidence, the negligence of the defendant. The jury shall be further instructed that injury alone does not raise a presumption of the defendant's negligence.

Tenn. Code Ann. § 29-26-115 (2000 and Supp. 2011). The three elements listed in subsection (a) of the statute must be proven by the testimony of a qualified expert. *Williams v. Baptist Mem'l Hosp.*, 193 S.W.3d 545, 553 (Tenn. 2006).

## A. Locality Rule

As noted by the Tennessee Supreme Court, Tenn. Code Ann. § 29-26-115

embraces the so-called "locality rule," which requires that the standard of professional care in a medical malpractice action be based upon the

community in which the defendant practices or in a similar community." As this Court recently explained:

A medical expert . . . must have knowledge of the standard of professional care in the defendant's applicable community or knowledge of the standard of professional care in a community *that is shown to be similar* to the defendant's community.

*Stovall v. Clarke*, 113 S.W.3d 715, 722 (Tenn. 2003).

Patient argues that the trial court erred in admitting Dr. Stovall as an expert witness in light of the locality rule. *See* Tenn. Code Ann. § 29-26-115(b). Specifically, Patient posits that "performing grand rounds a couple of times at a hospital in [Defendants'] community is insufficient to show that he is familiar with the standard of care in [Defendants'] medical community." Ms. Smith further asserts that Chattanooga and Memphis are insufficiently similar to satisfy the locality rule.

We review the trial court's decision to admit Dr. Stovall as an expert witness under the abuse of discretion standard. *Shipley v. Williams,* No. M2007-01217-SC-R11-CV, 2011 WL 3505281, at *21, ___ S.W.3d ___ (Tenn. Aug. 11, 2011). To that end, a trial court abuses its discretion when it "applie[s] an incorrect legal standard, or reache[s] a decision [that] is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997). Moreover, under an abuse of discretion standard, this court is not permitted to substitute its judgment for that of the trial court. *Williams v. Baptist Mem'l Hosp.*, 193 S.W.3d 545, 551 (Tenn. 2006).

In Shipley, our Supreme Court recently provided the following guidance on this previously nebulous area of the law that is the locality rule:

Generally, an expert's testimony that he or she has reviewed and is familiar with pertinent statistical information such as community size, hospital size, the number and type of medical facilities in the community, and medical services or specialized practices available in the area; has discussed with other medical providers in the pertinent community or a neighboring one regarding the applicable standard of care relevant to the issues presented; or has visited the community or hospital where the defendant practices, will be sufficient to establish the expert's testimony as relevant and probative to "substantially assist the trier of fact to understand the evidence or to determine a fact in issue" under Tennessee Rule of Evidence 702 in a medical malpractice case and to demonstrate that the facts on which the proffered expert relies are

trustworthy pursuant to Tennessee Rule of Evidence 703.

> . . . A proffered medical expert is not required to demonstrate "firsthand" and "direct" knowledge of a medical community and the appropriate standard of medical care there in order to qualify as competent to testify in a medical malpractice case. A proffered expert may educate himself or herself on the characteristics of a medical community in order to provide competent testimony in a variety of ways . . . .

*Shipley*, 2011 WL 3505281, at *21 (footnote omitted).

Applying the above principles from *Shipley*, we see no reason to hold that the trial court abused its discretion when it found that Dr. Stovall had sufficient knowledge of Dr. Mills's community to be admitted as an expert witness. In fact, the record is replete with evidence supporting the determination of the court. Most obviously, Dr. Stovall testified that he has actually been to Erlanger. Also, Dr. Stovall testified that he has given lectures in Chattanooga, that he is "in societies with physicians who practice in the Chattanooga area," and that "he has trained residents who practice [in Chattanooga]." Similarly, Dr. Stovall testified that Erlanger is "virtually identical," in terms of bed count, medical personnel, and services, to that of the Memphis hospitals where he has privileges. Furthermore, Dr. Stovall testified, with rough accuracy, about the current population of the Chattanooga area, and noted that Memphis and Chattanooga share similar community and cultural institutions.

An expert is not required to be familiar with all the medical statistics of the community where the defendant doctor practices. *Ledford v. Moskowitz*, 742 S.W.2d 645, 648 (Tenn. Ct. App. 1987). Additionally, the expert is not required to prove the two communities are identical; similarity is all that is required. *Lane v. McCartney*, No. E2008-02640-COA-R3-CV, 2009 WL 2341536 (Tenn. Ct. App. July 30, 2009).

Accordingly, we find that the trial court did not abuse its discretion when it admitted Dr. Stovall as an expert at trial, and we now affirm the trial court's ruling in that regard. We note that even if Dr. Stovall did not satisfy the locality rule, the other expert testimony supported the jury's verdict. Thus, any error in the admission of the testimony was harmless.

### B. Res Ipsa Loquitur

The trial court granted Defendants' motion for directed verdict on the res ipsa loquitur issue. The court concluded that the case was a battle of experts as to whether the stitching of the bowel was negligence. Therefore, the court determined the proper course was to allow

the jurors to "decide which expert they want to believe." Patient contends that the trial court erred in denying her requested jury instruction on res ipsa loquitur.

Because the granting of a directed verdict is a question of law, we review the trial court's decision de novo without a presumption of correctness. *Am. Gen. Fin. Serv., Inc. v. Goss*, No. E2010-01710-COA-R3-CV, 2011 WL 1326234, at 3 (Tenn. Ct. App., Apr. 7, 2011). Furthermore, we "must take the strongest legitimate view of the evidence in favor of the [nonmoving party], indulg[e] in all reasonable inferences in his favor, and disregard[] any evidence to the contrary." *Williams v. Brown*, 860 S.W.2d 854, 857 (Tenn. 1993) (quoting *Cecil v. Hardin*, 575 S.W.2d 268, 271 (Tenn. 1978)). In that vein, "[d]irected verdicts . . . are appropriate only when reasonable minds cannot differ as to the conclusions to be drawn from the evidence." *In re Estate of Marks*, 187 S.W.3d 21, 26-27 (Tenn. Ct. App. 2005). Notably, however, "a trial court may . . . direct a verdict with regard to an issue that can properly be decided as a question of law because deciding purely legal questions is the court's responsibility, not the jury's." *Id*.

Tenn. Code Ann. § 29-26-115(c) governs the applicability of res ipsa loquitur in medical malpractice cases, and provides that:

> In a malpractice action as described in subsection (a), there shall be no presumption of negligence on the part of the defendant; provided, there shall be a rebuttable presumption that the defendant was negligent where it is shown by the proof that the instrumentality causing injury was in the defendant's (or defendants') exclusive control and that the accident or injury was one which ordinarily doesn't occur in the absence of negligence.

Tenn. Code Ann. § 29-26-115(c) (2000 & Supp. 2010). Patient argues that her expert witness testified that the injury was one that ordinarily does not occur in the absence of negligence. She further asserts the instrumentality causing the injury was under the exclusive control of Dr. Mills while suturing the fascia.

Historically, res ipsa loquitur, which means, "the thing speaks for itself,"[2] was reserved for cases where the act was so obviously negligent that a layperson's common knowledge allowed an inference of negligence. *German v. Nichopoulos*, 577 S.W.2d 197, 202 (Tenn. Ct. App. 1978), *overruled by Seavers v. Methodist Med. Ctr. of Oak Ridge*, 9 S.W.3d 86 (Tenn. 1999). In *Seavers*, however, our Supreme Court expanded the reach of *res ipsa* to include cases that concern complex medical issues that are beyond the layperson's general understanding and that require expert testimony to prove causation, the standard of

---

[2] Black's Law Dictionary 1424-25 (9ᵀᴴ ED. 2009)

care, and/or that the injury does not ordinarily occur in the absence of negligence. *Id*. at 97. Because Patient cites heavily to *Seavers* in support of reversal, we take occasion to examine that case and have determined that Patient's interpretation of its holding is mistaken.

In *Seavers*, the plaintiff had been diagnosed with pneumonia and was admitted to the defendant's intensive care unit (ICU) for roughly one month. *Id*. at 88. While in the ICU, the plaintiff was heavily sedated, placed on a respirator, and her wrists were strapped to the bed rails to prevent her from removing her endotracheal tube. *Id*. The wrist restraints ultimately caused irreparable nerve damage to the plaintiff's right arm. *Id*. The plaintiff, relying on res ipsa loquitur, filed suit against the defendant -- alleging, basically, that she was admitted to the hospital with pneumonia and was discharged with an injured arm. *Id*. The trial court granted summary judgment to the defendant after finding that res ipsa loquitur was unavailable to the plaintiff because expert testimony was necessary to establish both the appropriate standard of care and whether negligence could reasonably be inferred from the circumstances. *Id*. at 90. This court affirmed, and the Supreme Court granted the plaintiff's application for permission to appeal. *Id*. The Supreme Court reversed and remanded, holding that "the res ipsa doctrine is available in medical malpractice cases to raise an inference of negligence even if expert testimony is necessary to prove causation, the standard of care, and the fact that the injury does not ordinarily occur in the absence of negligence." *Id*. at 97.

The *Seavers* Court expressly overruled any prior decisions that deemed res ipsa as only applicable in cases "where the proof is such that the jury can reasonably infer from common knowledge and experience that the defendant was negligent." *Seavers*, 9 S.W.3d at 92. Therefore, any pre-*Seavers* opinions concerning the applicability of res ipsa that do not offend the very specific holding of *Seavers*, remain good law. To that end, we now look to another Supreme Court case that we believe, although decided prior to *Seavers*, is still alive and well in Tennessee -- *Hughes v. Hastings*, 469 S.W.2d 378 (Tenn. 1971).

In *Hughes*, our highest court held that res *ipsa* is precluded in cases where evidence of a specific act or acts of negligence is introduced at trial. *Id*. at 383. The plaintiff was admitted to St. Joseph Hospital for an exploratory lumbar laminectomy. *Id*. at 379. The plaintiff testified that, just before being administered anesthesia, he told the defendant/anesthesiologist to "watch my teeth, because they had caps on them." *Id*. The plaintiff also testified that he had never met the defendant prior to that point and that the defendant had never examined the plaintiff's mouth before surgery. *Id*. During the procedure, the defendant inserted an endotracheal tube into the plaintiff's throat. *Id*. at 381. After the surgery was complete, the defendant stopped the intravenous drip of anesthesia going to the plaintiff, so that the plaintiff could begin breathing on his own. *Id*. The defendant testified that just before moving the plaintiff to the recovery room, the plaintiff suddenly bit down on

the plastic endotracheal tube -- breaking several of his caps. *Id*. The plaintiff called the hospital's medical record librarian as a witness; she testified that two medical notes, signed by the defendant, attributed the plaintiff's injury to his biting down on the endotracheal tube. *Id*. Accordingly, the defendant moved for a directed verdict on the plaintiff's res ipsa loquitur count at the close of all the proof. *Id*. at 382. The trial court, sustaining defendant's motion for directed verdict, determined that "although plaintiff had alleged res ipsa loquitur and had relied upon the doctrine in his proof in chief, defendant's explanation of the accident, coupled with plaintiff's attempt to show acts of negligence, destroyed the applicability of res ipsa loquitur." *Id*. at 382-83. The plaintiff's remaining three theories of negligence, however, were sent to the jury, which returned a defense verdict. *Id*. at 383. On appeal, we reversed, holding that the trial court had committed reversible error when it failed to submit a res ipsa charge to the jury. *Id*. On appeal to the Supreme Court, it was held that res ipsa loquitur is precluded in cases where evidence of a specific act or acts of negligence is introduced at trial. *Id*.

Reviewing the evidence in favor of Patient, we are unable to find that the trial court erred in entering a directed verdict for Defendants on the res ipsa issue. As was stated in *Hughes*, "Testimony becomes a vital factor as to the applicability or non-applicability of the doctrine of res ipsa loquitur." *Id*. at 379. We recognize that Dr. Wolk testified during re-direct that stitching the bowel while closing the fascia does not ordinarily occur in the absence of negligence, and he repeatedly stated that, in his opinion, Dr. Mills acted negligently when he stitched Patient's bowel to her fascia. Indeed, the thrust of Patient's case at trial was that Dr. Mills provided services that fell beneath the recognized standard of professional care when he stitched Ms. Smith's bowel to her fascia. Dr. Wolk testified on direct that "[i]t is my opinion that encompassing the bowel or grabbing the bowel with the stitch during the closure of an incision like this would not meet the standard of care." However, applying *Hughes*, we agree with the trial court that the facts of this case do not lend themselves to proving negligence circumstantially through res ipsa loquitur because Patient has presented evidence at trial of specific acts of negligence. The doctrine of res ipsa permits the jury to infer negligence when there is a lack of evidence about what occurred -- it is not a mechanism for having the jury ignore the evidence. In this case, the parties do not dispute what actually caused Patient's injury -- i.e. the inserting of a stitch into the bowel during the closing of the fascia. However, there was ample evidence in the record upon which the jury could find that this injury can occur even when the physician uses due care. Further, we cannot find that Patient established that this is the type of injury which ordinarily would not occur but for negligence. Thus, we affirm the judgment of the trial court that Patient failed to carry her burden of demonstrating that res ipsa loquitur applied in this case.[3]

---

[3]We note that Patient's negligence theories were submitted to the jury and rejected.

## C. Collateral Source Rule

Patient further asserts that the trial court erred in only allowing her to present evidence of the amounts paid to providers, which she believes contradicts Tennessee's modified collateral source rule found in Tenn. Code Ann. § 29-26-119. The statute provides that:

> In a malpractice action in which liability is admitted or established, the damages awarded may include (in addition to other elements of damages authorized by law) actual economic losses suffered by the claimant by reason of the personal injury including, but not limited to cost of reasonable and necessary medical care, rehabilitation services, and custodial care, loss of services and loss of earned income, but only to the extent that such costs are not paid or payable and such losses are not replaced, or indemnified in whole or in part, by insurance provided by an employer either governmental or private, by social security benefits, service benefit programs, unemployment benefits, or any other source except the assets of the claimant or of the members of the claimant's immediate family and insurance purchased in whole or in part, privately and individually.

Tenn. Code Ann. § 29-26-119 (2000).

We decline to address Patient's assertion of error with respect to a trial court's exclusion of evidence of some of her medical expenses because the jury found for Defendants as to liability. *See Ward v. Glover*, 206 S.W.3d 17, 41 (Tenn. Ct. App. 2006).

## D. Specific Dollar Amount for Non-Economic Damages

Next, Patient contends that the trial court erred in prohibiting her from arguing a specific dollar amount for damages in her closing argument. As the parties noted in their briefs, after the trial in this matter, our Supreme Court issued an opinion that held that medical malpractice plaintiffs are only prohibited by statute from reading their *ad damnum* clause to the jury, but are not prohibited from arguing or suggesting a specific dollar amount for non-economic damages. *Elliott v. Cobb*, 320 S.W.3d 246, 251 (Tenn. 2010).

As Dr. Mills points out in his brief, however, *Elliott* dealt with an interlocutory appeal from an order *in limine* prohibiting the plaintiff from arguing a specific dollar amount of non-economic damages to the jury. *Id.* at 247-48. In this case, however, we are reviewing a final judgment entered upon a jury verdict for the defense. "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole

record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b).

In this case, the jury never reached the issue of damages. Thus, we cannot say that the trial court's error "more probably than not affected the judgment." *Id.* Therefore, we deem any error committed by the trial court in this regard as harmless.

## E. The Jury's Verdict is supported by material evidence

As her last issue on appeal, Patient contends that had the trial court: (1) disallowed Dr. Stovall's testimony, and (2) charged the jury on a res ipsa loquitur theory of negligence, then the jury's verdict *sub judice* would be against the great weight of the evidence. Tenn. R. App. P. 13(d) commands that "[f]indings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Dr. Burnett's testimony that Dr. Mills complied with the standard of care and that this type of injury can occur even when excellent care is given and in the absence of negligence is sufficient evidence alone to support the verdict. Additionally, Dr. Mills testified that he did not deviate from the standard of care and described how a stitch can pass through the bowel even when the surgeon has used the utmost care. Thus, Patient's last issue has no merit.

## V. CONCLUSION

The judgment of the trial court is affirmed in all respects, and the costs of this appeal are taxed to the appellant, Kimberly L. Smith. This case is remanded, pursuant to applicable law, for collection of costs below.

_____
JOHN W. McCLARTY, JUDGE

-17-